# 25-1563

### UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

IN RE: EX PARTE APPLICATION OF SBK ART LLC

SBK ART LLC,

*Petitioner-Appellee,*

v.

AKIN GUMP STRAUSS HAUER & FELD LLP,

*Respondent-Appellant.*

On Appeal from the U.S. District Court
for the Southern District of New York

### PRINCIPAL BRIEF AND SPECIAL APPENDIX OF
### RESPONDENT-APPELLANT
### AKIN GUMP STRAUSS HAUER & FELD LLP

Anne M. Evans
Sean M. Nolan
Daniel W. Slemmer
AKIN GUMP STRAUSS HAUER
  & FELD LLP
One Bryant Park
New York, NY 10036
(212) 872-1000

James E. Tysse
Lide E. Paterno
Kristen E. Loveland
AKIN GUMP STRAUSS HAUER
  & FELD LLP
2001 K Street, NW
Washington, DC 20006
(202) 887-4000
jtysse@akingump.com

*Counsel for Respondent-Appellant*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Respondent-Appellant Akin Gump Strauss Hauer & Feld LLP, by and through its undersigned counsel, respectfully represents that it does not have any corporate parents, and no publicly held corporation owns 10% or more of its stock.

i

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .............................................i

TABLE OF AUTHORITIES...............................................................iv

JURISDICTIONAL STATEMENT .....................................................1

ISSUES PRESENTED FOR REVIEW ..................................................2

INTRODUCTION .............................................................................3

STATEMENT OF THE CASE .............................................................6

    A.    Statutory Background..........................................................6

    B.    Factual Background ............................................................8

            1.    *Sberbank's And SBK's Subjection To Sanctions Following Russia's Illegal Invasion Of Ukraine*.................................8

            2.    *Fortenova's Inability To Ascertain The Legitimacy Of SBK's Purported Sale*..................10

            3.    *SBK's Listing By The EU Council* ......................12

            4.    *Fortenova's Efforts To Restructure Without Sanctioned SBK* ..................................................13

            5.    *SBK's Foreign Litigation Campaign* ..................15

    C.    Procedural Background.......................................................17

            1.    *SBK's Application For Discovery From Akin Under 28 U.S.C. § 1782* .....................................17

            2.    *The Magistrate Judge's Report And Recommendation*................................................19

            3.    *The District Court's Decisions*...........................21

SUMMARY OF ARGUMENT ..............................................................23

STANDARD OF REVIEW...................................................................25

ARGUMENT ..................................................................................26

I. THE DISTRICT COURT SHOULD NOT HAVE PERMITTED SECTION 1782 DISCOVERY FROM A LAW FIRM HOLDING CLIENT DOCUMENTS THAT ARE NOT DISCOVERABLE FROM THE CLIENT ITSELF ......................... 26

A. If Documents Are Undiscoverable From Fortenova Abroad, They Are Undiscoverable From Akin Under Section 1782 .......................................................... 26

    1. *Precedent Limits A Foreign Litigant's Ability To Demand Client Documents From A Law Firm* .............................................................. 26

    2. *The Documents Sought From Akin Are Not Discoverable From Its Foreign Client* ................. 31

B. The District Court Erred In Ignoring The *Fisher* Principle ........................................................... 35

    1. *The District Court Erred In Narrowing* Kiobel *To Its Facts* ................................ 36

    2. *The* Fisher *Principle Is Not Limited To Attorney-Client Privileged Documents* ................ 40

    3. *The District Court's "Lobbying" Exception Undermines The* Fisher *Principle* ........................ 43

II. AT A MINIMUM, THE DISTRICT COURT'S FAILURE TO TAKE ACCOUNT OF EXTRATERRITORIALITY CONSIDERATIONS REQUIRES VACATUR AND REMAND ......................................................................... 48

CONCLUSION ................................................................... 52

# TABLE OF AUTHORITIES

C<small>ASES</small>:

*ACLU v. National Sec. Agency*,
  925 F.3d 576 (2d Cir. 2019) ......................................................... 41

*American Oversight v. United States Dep't of Just.*,
  45 F.4th 579 (2d Cir. 2022) ......................................................... 41

*Banoka S.à.r.l. v. Elliott Mgmt. Corp.*,
  148 F.4th 54 (2d Cir. 2025) ................................................ *passim*

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
  673 F.3d 76 (2d Cir. 2012) ........................................................... 51

Case T-102/23, SBK Art OOO v. Council of the European
  Union, ECLI:EU:T:2025:416 (April 30, 2025) ....................... 15, 16, 44

*Fisher v. United States*,
  425 U.S. 391 (1976) .............................................................. *passim*

*In re Accent Delight Int'l Ltd.*,
  869 F.3d 121 (2d Cir. 2017) ....................................................... 1, 7

*In re Accent Delight Int'l Ltd.*,
  No. 16-MC-125, 2018 WL 2849724 (S.D.N.Y. June 11,
  2018) ........................................................................................... 39
  791 F. App'x 247 (2d Cir. 2019) ................................................. 39

*In re Alghanim*,
  No. 21-MC-167, 2022 WL 1423088 (S.D.N.Y. May 5, 2022) ............. 32

*In re Application for an Ord. Permitting Metallgesellschaft*
  *AG to take Discovery*, 121 F.3d 77 (2d Cir. 1997) ......................... 28

*In re B&C Kb Holding GmbH*,
  No. 23-1014, 2024 WL 3170983 (2d Cir. June 26, 2024) ........... *passim*

*In re del Valle Ruiz*,
  939 F.3d 520 (2d Cir. 2019) ...................................................... 31, 49

*In re Hulley Enters., Ltd.*,
    358 F. Supp. 3d 331 (S.D.N.Y 2019) ..................................... 31, 49, 50

*In re Hulley Enters. Ltd.*,
    400 F. Supp. 3d 62 (S.D.N.Y. 2019) ................................................ 37

*In re Mare Shipping Inc.*,
    No. 13-misc.-238, 2013 WL 5761104 (S.D.N.Y. Oct. 23,
    2013) ................................................................................................ 32

*In re Sarrio, S.A.*,
    119 F.3d 143 (2d Cir. 1997) ..................................................... *passim*

*In re Texas Auto Dealers Ass'n*,
    No.03-40860, 2003 WL 21911333 (5th Cir. July 25, 2003) ............... 46

*In re Warren*,
    No. 20-misc-208, 2020 WL 6162214 (S.D.N.Y. Oct. 21,
    2020) ................................................................................................ 37

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004) ................................................................. *passim*

*Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*,
    895 F.3d 238 (2d Cir. 2018) ..................................................... *passim*

*Mees v. Buiter*,
    793 F.3d 291 (2d Cir. 2015) ...................................................... 7, 33

Mokhovikov Mikhail Noe v. Open Pass Limited, No.
    856/2023 (Civil Court, First Hall 2023) (Malta) .............................. 17

*Ratliff v. Davis Polk & Wardwell*,
    354 F.3d 165 (2d Cir. 2003) ..................................................... *passim*

*Robinson v. Texas Auto. Dealers Ass'n*,
    214 F.R.D. 432 (E.D. Tex. 2003) ...................................................... 46

*Schmitz v. Bernstein Liebhard & Lifshitz, LLP.*,
    376 F.3d 79 (2d Cir. 2004) .............................................................. 32

v

**STATUTES:**

28 U.S.C.
§ 1291 ....................................................................................... 1
§ 1331 ....................................................................................... 1
§ 1782 ............................................................................... *passim*
§ 1782(a) ........................................................................... 6, 7, 37

**OTHER AUTHORITIES:**

8 J. Wigmore, Evidence (McNaughton rev. 1961) ................................. 28

AM. BAR. ASS'N, MODEL RULES OF PROFESSIONAL CONDUCT,
Preamble (2024) ............................................................. 41, 42

Code of Organization and Civil Procedure, Art. 558 (1855)
(Malta) .................................................................................. 34

FED. R. APP. P. 4(a)(2) .............................................................. 1

*Lobby*, BLACK'S LAW DICTIONARY (12th ed. 2024) ................................. 44

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291, because the appeal is from a final decision granting discovery under 28 U.S.C. § 1782, entered on May 30, 2025.  *See In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 128 (2d Cir. 2017) ("Orders granting (or denying) applications for discovery under Section 1782 are considered final adjudications and are immediately appealable under 28 United States Code Section 1291.").  The district court had subject matter jurisdiction under 28 U.S.C. § 1331, because Petitioner SBK ART LLC's application for discovery was made under 28 U.S.C. § 1782.  Respondent Akin Gump Strauss Hauer & Feld LLP's notice of appeal was timely filed on June 23, 2025, in accordance with Federal Rule of Appellate Procedure 4(a)(2).

1

## ISSUES PRESENTED FOR REVIEW

1) Whether the district court erred in granting Petitioner's application under 28 U.S.C. § 1782 for discovery from a law firm of documents that belong to, but may not be obtained from, the law firm's client.

2) Whether the district court erred in failing to consider the foreign location and discoverability of requested documents before granting Petitioner's application for those documents.

## INTRODUCTION

Sberbank is Russia's largest financial institution and majority-owned by the Russian government. After Russia's illegal invasion of Ukraine, Sberbank put its holdings in Fortenova—a major food and retail company in southeastern Europe—in a wholly owned special purpose vehicle: Petitioner SBK ART LLC ("SBK"). SBK soon found itself subject to the same sanctions imposed by Western governments against Sberbank. So Sberbank purported to sell SBK to an individual named H.E. Saif Jaffar Suhail Markhan Alketbi ("Mr. Alketbi").

To avoid running afoul of sanctions regimes, Fortenova needed to determine whether the sale to Mr. Alketbi was legally valid. It turned to its lead English counsel—lawyers in the London office of Respondent Akin Gump Strauss Hauer & Feld LLP ("Akin")—to assess the sale and its legal implications. Akin determined that SBK had provided insufficient information to verify the sale's legitimacy and thus counseled Fortenova that recognizing SBK's voting rights would subject Fortenova to legal risk. Thereafter, Fortenova decided to remove SBK from its ownership structure. In response, SBK launched a barrage of baseless lawsuits against Fortenova across Europe. Unable to obtain pre-suit

3

discovery from Fortenova itself, SBK brought an action in U.S. district court seeking discovery from Akin (which has a New York office) under 28 U.S.C. § 1782—a specialized statute that permits foreign litigants to obtain discovery under certain circumstances from a party within a U.S. court's jurisdiction.

The district court erred in partially granting SBK's Section 1782 application. The documents SBK seeks from Akin belong to Fortenova, but they are not discoverable from Fortenova in any of the foreign jurisdictions SBK seeks to use them. Both this Court and the Supreme Court have explained that allowing discovery of documents from a client's law firm that are undiscoverable from the client itself impairs the integrity of the legal system. Fundamentally, it makes clients less willing to confide in or seek advice from legal counsel. In the context of foreign-litigant discovery requests under Section 1782, it also makes foreign companies less likely to engage U.S. law firms. Under Supreme Court and Second Circuit precedent, because the requested documents are not discoverable from Fortenova in the foreign jurisdictions, the district court "should not" have exercised its discretion to order discovery from Fortenova's law firm under Section 1782, either.

4

That conclusion is reinforced by the paper-thin connection between the documents sought by SBK and the United States. Not only does SBK's litigation campaign concern foreign parties and events that occurred in foreign jurisdictions that do not permit such pre-suit discovery from Fortenova, but they also involve documents primarily—if not exclusively—located in London (even if accessible worldwide via Akin's shared IT servers). The district court failed to account properly for such extraterritoriality considerations in deciding whether to grant SBK's application. Indeed, the court erroneously concluded that it "should not consider the discoverability of the evidence in the foreign proceeding" at all. That too was error.

Because the requested documents are not discoverable from Fortenova in the foreign jurisdictions—and therefore are not discoverable from Fortenova's London lawyers (let alone their New York colleagues)—this Court should reverse the district court's grant of Section 1782 discovery against Akin. At the very least, this Court should vacate the district court's decision and remand with instructions for the district court to weigh such extraterritoriality concerns alongside the

other discretionary factors in determining whether to grant SBK's application.

## STATEMENT OF THE CASE

### A. Statutory Background

Section 1782 permits a district court "upon the application of any interested person," to order a person within its jurisdiction to provide evidence "for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a). Where Section 1782's statutory requirements are met, courts consider at least four additional factors—commonly referred to as the *Intel* factors—relevant to the statute's "twin aims of providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 252 (2004) (internal quotation marks omitted). Those factors are:

> (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," in which case "the need for § 1782(a) aid generally is not as apparent";

> (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance";

6

(3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and

(4) whether the request is "unduly intrusive or burdensome."

*Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015) (quoting *Intel Corp.*, 542 U.S. at 264-265).

The *Intel* factors are "non-exclusive," and this Court has cautioned that they "are not to be applied mechanically." *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 244-245 (2d Cir. 2018). Rather, "[d]istrict courts are instructed to take into account any other pertinent issues arising from the facts of the particular dispute in addition to the *Intel* factors," such as "the foreign location of the documents" sought, "the foreign status of their primary custodian," and the impact of permitting discovery on the relationships of "U.S. law firms with foreign clients." *Banoka S.à.r.l. v. Elliott Mgmt. Corp.*, 148 F.4th 54, 65, 70 (2d Cir. 2025) (internal quotation marks and citations omitted). And district courts should "weed out abusive Section 1782 applications," even if they "satisfy the statutory criteria." *In re B&C Kb Holding GmbH*, No. 23-1014, 2024 WL 3170983, at *3 (2d Cir. June 26, 2024) (quoting *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 136 (2d Cir. 2017)).

## B. Factual Background

Fortenova is a major food and retail company based in Zagreb, Croatia, with operations in several countries in Europe. JA-382-383, ¶ 5. As the largest private employer in southeastern Europe, it is critical to both the Croatian and Slovenian economies. *Id.* Akin, a multinational law firm with offices throughout the U.S. and across the globe, has been one of Fortenova's primary law firms for many years.[1] Lawyers in Akin's London office—who are employed by Akin Gump LLP, a separate entity—have served as lead English legal counsel to Fortenova on issues arising from the presence of equity holders in its capital structure that were the subjects (or likely subjects) of government-imposed sanctions.

### 1. Sberbank's And SBK's Subjection To Sanctions Following Russia's Illegal Invasion Of Ukraine

One sanctioned holder of Fortenova equity was Sberbank, "the largest financial institution in Russia" and "majority-owned by the Government of the Russian Federation." JA-383-384, ¶ 8. In April 2022, following Russia's illegal invasion of Ukraine, Sberbank placed its

---

[1] This brief uses "Akin" to refer to both Akin Gump Strauss Hauer & Feld LLP, the American multinational law firm, and Akin Gump LLP, the specific entity that employs Akin's UK solicitors.

holdings of Fortenova equity in a wholly owned special purpose vehicle, SBK, making SBK the largest minority owner of Fortenova. JA-383, ¶ 7. Thereafter, Sberbank and SBK began to face sanctions resulting from Russia's illegal invasion.

For instance, on April 6, 2022, the United States Office of Foreign Assets Control ("OFAC") targeted Sberbank with full U.S. blocking sanctions. JA-383-384, ¶ 8. That same day, the United Kingdom identified Sberbank (including its owned and controlled subsidiaries) as an entity that financially supported and was involved in an economic sector providing a substantial source of revenue to the Russian government. *Id.* The United Kingdom thus made Sberbank a designated person under Regulation 10 of the UK's Russia (Sanctions) (EU Exit) Regulations 2019, and subjected Sberbank and SBK—as an entity owned or controlled by Sberbank—to an asset freeze. *Id.* A little over a month later, the European Union likewise subjected Sberbank and its subsidiaries to an asset freeze, with the Council of the European Union

9

("EU Council") listing Sberbank in Annex I to Council Regulation (EU) No 269/2014.[2] *Id.*

Due to such sanctions, SBK's significant ownership stake became a serious source of disruption and uncertainty for Fortenova, at substantial economic cost. JA-384-385, ¶ 10. Fortenova had been exploring options to refinance €1.157 billion in senior debt that previously matured in September 2023. *Id.* But the sanctions placed on Sberbank and SBK deterred potential counterparties in the capital markets from exploring financing options with Fortenova. JA-385, ¶ 11. As a result, Fortenova was forced to seek expensive, short-term extensions to its existing senior debt from its primary creditor. *Id.*

> **2.** *Fortenova's Inability To Ascertain The Legitimacy Of SBK's Purported Sale*

In October 2022, Sberbank attempted to transfer 100% of its ownership interest in SBK to Mr. Alketbi. JA-385, ¶ 12. Fortenova sought to ascertain the legitimacy of the transaction, in part to determine whether Fortenova could restore voting rights to SBK without running

---

[2] Council Regulation (EU) No 269/2014 imposes sanctions on individuals and entities "responsible for actions which undermine or threaten the territorial integrity, sovereignty and independence of Ukraine." Sanctioned persons are listed in Annex I to the regulation.

afoul of EU sanctions regulations. JA-150; JA-385-386, ¶ 13. But SBK refused to provide Fortenova the requested information. JA-385-386, ¶ 13. Thus, Fortenova could not ascertain the source of funds used to complete the purported transfer and the satisfaction of "Know Your Customer," anti-money laundering, and terrorism financing checks, or whether requisite EU licensing of the transaction had been obtained. *Id.* Unable to verify that Sberbank did not retain any residual interests in or control over SBK, Fortenova concluded that it must continue to treat SBK as a sanctioned entity. *Id.*

As Fortenova's lead English legal counsel, lawyers in Akin's London office provided legal advice to Fortenova on these critical issues. Specifically, Akin provided a legal memorandum to Fortenova in December 2022 (the "Akin Opinion") advising that, "in view of the applicable legal provisions of EU sanctions regulations, the relevant provisions of Dutch criminal law, as well as the relevant provisions of EU and Dutch anti-money laundering *** legislation," the limited information SBK had provided Fortenova was insufficient to confirm that the purported sale of SBK to Mr. Alketbi was in compliance with applicable law or that SBK should no longer be considered subject to an

11

asset freeze. JA-149. As a result, Akin advised that Fortenova could not recognize the exercise of voting rights by SBK, because doing so would breach EU sanctions regulations and could expose Fortenova to money-laundering charges. JA-150.

### 3. SBK's Listing By The EU Council

Due to the purported sale's lack of transparency and apparent disregard for European regulatory requirements, SBK's alleged transfer to Mr. Alketbi also did not solve SBK's sanctions problems.

In a decision dated November 25, 2022, the Croatian government concluded that the transactions through which Mr. Alketbi purportedly acquired ownership of SBK had not been carried out in accordance with EU sanctions regulations. JA-385, ¶ 12. A month later, the EU Council listed SBK under Annex I to Regulation 269/2014. JA-386, ¶ 14. In deciding to sanction SBK, the EU Council reasoned that "Sberbank retains effective control over SBK ART LLC notwithstanding the purported transfer of its shares to a businessman in the United Arab Emirates." JA-557.

### 4. *Fortenova's Efforts To Restructure Without Sanctioned SBK*

Given the red flags raised by the purported transfer of SBK to Mr. Alketbi, SBK continued to pose problems for Fortenova's efforts to find a transaction counterparty to refinance its senior debt. JA-387, ¶ 16. As a result, Fortenova began to explore options to remove SBK from its ownership structure.

One such option involved the sale of a Dutch subsidiary holding company, Fortenova Group MidCo B.CV. ("MidCo"). But even that sales process initially proved unsuccessful, with multiple potential purchasers indicating that they considered the acquisition too challenging while sanctions remained a material concern for Fortenova. JA-387, ¶ 17. In need of a solution to remain a going concern, Fortenova explored the sale of MidCo to an entity that would be capitalized by its non-sanctioned equity holders and underwritten by its largest non-sanctioned equity holder, Open Pass Limited. JA-387-388, ¶ 18. Fortenova announced in November 2023 that it had entered into a transaction support agreement with Open Pass to implement the sale of MidCo for cash consideration on closing of €500 million. *Id.* The transaction was approved a month later

13

and completed on July 9, 2024.[3] JA-388, ¶ 19. Because sanctioned entities were not eligible to participate in the new ownership structure, the transaction removed SBK and Sberbank's taint, allowing Fortenova to resume its activities without being weighed down by sanctioned owners. JA-388, ¶ 19.

Akin's London office advised Fortenova on legal issues related to Fortenova's ownership restructuring (the "Corporate Changes"), which was intertwined with Akin's legal counsel regarding the sanctions issues.[4] JA-1509, ¶ 4. All of the work that Akin performed for Fortenova with respect to SBK's purported sale and the presence of sanctioned holders (like SBK) in its capital structure was conducted outside the

---

[3] Since the completion of the MidCo sale, Fortenova has been split into two structures: a "legacy" structure (two Dutch holding companies with the entity Fortenova Group STAK Stichting, a Dutch foundation, on top of the structure), which has no operating business, and a "new" operating structure funded by non-sanctioned equity holders of the "legacy" structure. For ease of reference, the series of Fortenova companies in the "legacy" structure and "new" operating structure will be collectively referred to herein as "Fortenova."

[4] In its revised subpoena, SBK defined "Corporate Changes" as "the corporate reorganization of the Fortenova Group in favor of Open Pass Limited and its owners, first approved at a meeting on or about January 12, 2023, and subsequently closed on July 9, 2024." JA-1521; *see also* SPA-52 (district court decision defining "Corporate Changes" as "changes to Fortenova's corporate structure *** [that] resulted, in January 2023, in *** Open Pass gaining control of Fortenova").

14

United States.  *Id.*  Although certain U.S. Akin employees have registered as lobbyists for Fortenova, none of the timekeepers who performed work for Fortenova outside the United States are qualified to perform lobbying services in the European Union or the United Kingdom, nor are any registered on the European Transparency Register or the Register of Consultant Lobbyists, as is required for lobbying services.  JA-1510, ¶ 8.

### 5. *SBK's Foreign Litigation Campaign*

Following SBK's designation as a sanctioned entity by the EU Council and the steps Fortenova took to amend its corporate governance structure to protect its business, SBK launched a litigation campaign against the EU Council and Fortenova.

First, SBK filed an action against the EU Council in the EU General Court, seeking reversal of the EU Council's sanctions decisions (the "EU Action").  The EU General Court rejected SBK's application, concluding that the EU Council's finding that SBK remained a "subsidiary of Sberbank" was "well founded."  Judgment, Case T-102/23, SBK Art OOO v. Council of the European Union, ECLI:EU:T:2025:416 ¶ 204 (April 30,

15

2025) ("EU General Court Op.").[5]  The Court found that the purported "transfer by Sberbank to an Emirati investor" of SBK's holdings in Fortenova had been done "without authorisation from a competent national authority" and thus "ha[d] no effect under EU law."  *Id.* ¶ 199. Because the EU Council's conclusion that SBK remained a "subsidiary of Sberbank" was supported by a "sufficiently specific, precise and consistent body of evidence," SBK's delisting application was dismissed. *Id.* ¶¶ 202-205.

Second, SBK instituted an action against Fortenova in the Civil Court of Malta in August 2023 (the "Malta Proceeding").  SBK has described the Malta Proceeding as an action for "damages caused to SBK ART by the approval of the changes to the corporate governance in Fortenova Group."  JA-355.  The Malta Proceeding is currently in the "preliminary pleas" phase of litigation, during which the Malta court considers affirmative defenses raised by the defendants, including Fortenova.  JA-395, ¶ 17.  Judgment on the preliminary pleas has been

---

[5] https://curia.europa.eu/juris/document/document.jsf?text=&docid=298679&pageIndex=0&doclang=EN&mode=lst&dir=&occ=first&part=1&cid=17541738).

adjourned to February 26, 2026.[6] In April 2024, in a separate proceeding filed by SBK for an injunction against Fortenova and others, a Maltese court issued a final, non-appealable decision dismissing the case, holding that the court lacked jurisdiction and that SBK's litigation was vexatious and oppressive. JA-396, ¶ 20, JA-407, ¶ 16.

Finally, SBK has said it is pursuing a "potential new claim" in the Netherlands or "another foreign court" to seek damages that it alleges were caused by the sale of MidCo. Although SBK has pursued other (unsuccessful) actions in the Netherlands, to date SBK has yet to initiate the contemplated action seeking damages allegedly caused by MidCo's sale.

## C. Procedural Background

### 1. SBK's Application For Discovery From Akin Under 28 U.S.C. § 1782

In putative aid of its foreign litigation campaign, SBK targeted Akin with the Section 1782 application that underlies this appeal (the "Application"). The Application seeks discovery from Akin related to the

---

[6] *See* Mokhovikov Mikhail Noe v. Open Pass Limited, No. 856/2023 (Civil Court, First Hall 2023) (Malta), https://ecourts.gov.mt/onlineservices/CivilCases/Detail/447723.

legal counsel Akin provided Fortenova regarding the purported transfer of SBK from Sberbank to Mr. Alketbi and Fortenova's efforts to restructure in light of the transfer's apparent legal invalidity.

Specifically, SBK sought from Akin, among many other things, the production of all non-privileged documents and communications related to the purported transfer in SBK's ownership and the changes in Fortenova's ownership structure, including documents and communications relating to sanctions imposed by the United States, United Kingdom, and European Union; communications between Akin and various of Fortenova's other service providers and entities in its ownership structure; and communications between Akin and various governmental entities, such as the U.S. Department of Treasury's Office of Foreign Assets Control, the U.S. State Department, the Dutch Ministry of Finance, the U.K. Office of Financial Sanctions Implementation, the National Bank of Serbia, Croatian government officials and staff, and EU officials and staff. *See* JA-75, JA-84-86.

SBK also sought to depose Akin about, among other topics relating to Akin's legal advice, its role and responsibilities in analyzing Mr. Alketbi's acquisition of SBK; the support for the Akin Opinion's

18

conclusion that Sberbank appeared to retain effective control over SBK; and information provided to Akin concerning Mr. Alketbi's acquisition of SBK and the changes in Fortenova's ownership structure. *See* JA-80-83.

### 2. *The Magistrate Judge's Report And Recommendation*

The district court referred SBK's Application to a magistrate judge, and Akin submitted an opposition, together with supporting declarations, including from multiple foreign legal experts.

After hearing oral argument on July 23, 2024, the magistrate judge issued her Report and Recommendation, recommending that the district court grant the Application, subject to proposed limitations on the scope of discovery. *See* SPA-45-46. After concluding that SBK satisfied the three statutory requirements of Section 1782, the magistrate judge turned to the discretionary *Intel* factors. The magistrate judge found that the first *Intel* factor weighed against granting discovery because "it seems likely that many of the documents sought by the proposed subpoenas could be demanded by Fortenova Group from [Akin]," and hence by SBK from Fortenova, making Fortenova the "real party from whom documents are sought." SPA-27-29. The first *Intel* factor thus "cut against granting the Application," because the party from whom

19

discovery was sought—Fortenova—was a party in the foreign proceedings. SPA-29.

The magistrate judge concluded that the other three factors nonetheless weighed in favor of granting the Application. The second factor, which asks about the receptivity of the foreign tribunal to judicial assistance, was not in dispute. SPA-30-31. As to the third factor, the magistrate judge (as relevant here) addressed only whether the foreign courts would prohibit discovery or "reject" evidence gathered under Section 1782, declining to consider the related argument of whether such evidence was discoverable in the foreign proceedings. SPA-34-35. The magistrate judge decided that the parties could address the extent to which any discovery is "protected from production by foreign privilege or confidentiality law" in the meet-and-confer process. SPA-35.

As to the fourth *Intel* factor—whether the discovery request is unduly intrusive or burdensome—the magistrate judge acknowledged this Court had repeatedly expressed concern for protecting the attorney-client relationship against intrusive discovery. SPA-41; *see Kiobel*, 895 F.3d at 247; *In re Sarrio, S.A.*, 119 F.3d 143 (2d Cir. 1997). But the magistrate judge believed such concerns were "not dispositive" with

20

respect to Akin's role as legal counsel—and inapplicable to the extent Akin purportedly acted as a lobbyist or gave business or other so-called "non-legal advice." SPA-41.

In the end, the magistrate judge recommended granting the Application but narrowing SBK's proposed subpoena and limiting the scope of discovery to non-privileged materials uniquely possessed by Akin or shared with third parties other than Fortenova between February 1, 2022, and December 31, 2023, related to: (1) Mr. Alketbi's acquisition of SBK; (2) the Akin Opinion; and (3) the Corporate Changes. *See* SPA-43-44.

### 3. *The District Court's Decisions*

In a May 30, 2025 opinion, the district court adopted the magistrate judge's R&R in its entirety. Like the magistrate judge, the district court deemed irrelevant whether foreign jurisdictions facilitate discovery of requested materials (*i.e.*, foreign discoverability), even suggesting that a court "should not" consider such foreign discoverability in its discretionary balancing of the *Intel* factors. SPA-64-65.

The district court then rejected the argument that this Court's decision in *Kiobel* required denial of SBK's attempt to seek discovery from

21

Fortenova's legal counsel of documents that were not discoverable from Fortenova itself. SPA-68-76. The district court characterized *Kiobel* as primarily concerned not with protecting the attorney-client relationship against intrusive discovery under Section 1782, but with the use of Section 1782 to circumvent a protective order. SPA-69, SPA-72-73. The district court concluded that even if the Application raised concerns about chilling communications between Fortenova and its attorneys, those concerns were addressed by the fact that discovery was limited to non-privileged documents and tailored to SBK's litigation needs. SPA-74. And the district court suggested that *Kiobel* was in any case inapposite, because even though the Akin Opinion was written to advise Fortenova on the company's legal obligations in light of SBK's purported transfer to Mr. Alketbi, it was a "lobbying document" to the extent Fortenova shared it with a Dutch court and the EU Council. SPA-73.

After the district court's decision, SBK served a revised (and exceptionally broad) subpoena on Akin, requesting *inter alia* "[a]ll Documents concerning or relating to" (1) the purported transfer of SBK to Mr. Alketbi, (2) the Corporate Changes, or (3) the Akin Opinion. JA-1528.

22

Upon Akin's request, however, the district court subsequently stayed its decision because it viewed this appeal as raising "a serious legal question." JA-2073. Specifically, this Court has yet to "define the precise contours of when a district court may or may not compel disclosure under § 1782 of materials held by U.S. law firms as a result of representations of foreign clients where such material is not discoverable abroad," and under *Kiobel*'s logic, this Court could determine that a district court should deny discovery where a law firm "simultaneously rendered legal and lobbying services to the same client." JA-2075.

## SUMMARY OF ARGUMENT

**I.** This case is controlled by *Kiobel*'s observation that "a district court *should not* exercise its discretion to grant a Section 1782 petition for documents held by a U.S. law firm in its role as counsel for a foreign client if the documents are undiscoverable from the client abroad, because this would disturb attorney-client communications and relations." *Kiobel*, 895 F.3d at 246 (emphasis added). The documents that Petitioner seeks from Akin are not discoverable from Akin's client, Fortenova, in any of the foreign jurisdictions in which Petitioner seeks to bring litigation. This Court should therefore reverse the district court's

23

decision granting Section 1782 discovery of those documents from Akin. As the Supreme Court has recognized, allowing discovery from a client's lawyers that is unavailable from the client itself impairs the integrity of our legal system by making clients less willing to confide in and seek advice from counsel. *Fisher v. United States* , 425 U.S. 391 (1976). As *Kiobel* noted in the Section 1782 context, it also discourages foreign clients from hiring law firms with U.S. offices.

The district court failed to appreciate the import of *Kiobel* and its embrace of the *Fisher* principle. The district court erroneously limited the principle to attorney-client/work-product privileged documents, despite this Court's express acknowledgment that the principle extends to all documents held by attorneys for their clients, "regardless of their content." *Ratliff v. Davis Polk & Wardwell*, 354 F.3d 165, 170 (2d Cir. 2003). And the district court applied a standardless "lobbying" exception—threatening to swallow the *Fisher* principle altogether— despite the undisputed fact that Akin performed extensive "legal" work. In light of the district court's legal errors, this Court should reverse its grant of SBK's application.

24

**II.** In the alternative, this Court should vacate the district court's decision and remand with instructions for the district court to account for the significant extraterritoriality considerations counseling against a grant of SBK's application. This Court's recent decision in *Banoka* confirms that such factors—including not only the foreign location of the documents and their custodians, but also whether such documents are discoverable under foreign law—are at least relevant to the exercise of a court's discretion in deciding whether to grant a Section 1782 application. Because the district court failed to take adequate account of these considerations—and believed it could not account for foreign discoverability at all—its decision should, at minimum, be vacated.

## STANDARD OF REVIEW

This Court reviews a district court's application of the *Intel* factors for abuse of discretion. *Banoka*, 148 F.4th at 64-65. "Where a district court exercises its discretion premised on the misapplication of a legal principle, the court by definition abuses its discretion and makes an error of law." *Ratliff*, 354 F.3d at 168.

25

## ARGUMENT

### I. THE DISTRICT COURT SHOULD NOT HAVE PERMITTED SECTION 1782 DISCOVERY FROM A LAW FIRM HOLDING CLIENT DOCUMENTS THAT ARE NOT DISCOVERABLE FROM THE CLIENT ITSELF

Under longstanding Supreme Court and Second Circuit precedent—including in the Section 1782 context specifically—a party cannot use Section 1782 to obtain documents and testimony from a client's law firm that are undiscoverable from the client abroad. That rule applies here with special force, given that the demanded documents are the product of representation by the foreign office of an international law of a foreign client, and are accessible in the United States solely because of shared IT servers that provide access across the law firm's international offices. Permitting discovery here would have the same chilling effects on attorney-client relations of which this Court has repeatedly warned.

#### A. If Documents Are Undiscoverable From Fortenova Abroad, They Are Undiscoverable From Akin Under Section 1782

##### 1. *Precedent Limits A Foreign Litigant's Ability To Demand Client Documents From A Law Firm*

This case is controlled by *Kiobel*'s observation that "a district court *should not* exercise its discretion to grant a Section 1782 petition for

26

documents held by a U.S. law firm in its role as counsel for a foreign client if the documents are undiscoverable from the client abroad, because this would disturb attorney-client communications and relations." 895 F.3d at 246 (emphasis added). In *Kiobel*, this Court reversed a decision that had permitted a Section 1782 applicant to obtain materials from legal counsel that were unobtainable from the counsel's foreign client. The Court concluded that the relevant documents were not discoverable from the client, first, because they were protected by a "confidentiality order," and second, because Dutch discovery practices were "more restrictive" of such discovery. *Id.* (emphasis added). Because those factors meant the documents were not discoverable from the client in the Netherlands, Section 1782 could not be used to obtain them from the client's law firm, which held them in the U.S. *See id.* at 246 ("[W]hen a client is privileged from producing documents, so too is the client's counsel.").

*Kiobel* derived its holding from a line of caselaw stemming from the Supreme Court's decision in *Fisher v. United States*, 425 U.S. 391 (1976). In *Fisher*, the Court concluded that "[w]hen the client himself would be privileged [f]rom production of [a] document, *** the attorney having possession of the document is not bound to produce [it]." 425 U.S. at 404

27

(quoting 8 J. Wigmore, Evidence § 2307, p. 592 (McNaughton rev. 1961)). The Supreme Court viewed the rule as necessary to the integrity of the legal system. It reasoned that "[a]s a practical matter, if the client knows that damaging information could more readily be obtained from the attorney ***, the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice." *Id.*

As *Kiobel* indicates, that *Fisher* principle applies equally in the context of Section 1782, where applicants who cannot obtain documents from a foreign target under a foreign jurisdiction's discovery rules may instead try to obtain them from a U.S. office of the foreign target's law firm. In such circumstances, a district court should decline to compel Section 1782 discovery from the foreign target's legal counsel. The *Fisher* principle thus differs from the otherwise-applicable rule that evidence sought under Section 1782 need not "be discoverable under the laws of the foreign country that is the locus of the underlying proceeding." *In re Application for an Ord. Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997). The basis for *Fisher*'s exception is grounded in sound policy reasons specific to the attorney-client relationship: "*Fisher*'s rule[, which] arose from the policy of promoting

28

open communications between lawyers and their clients," "would be jeopardized if documents unreachable in a foreign country became discoverable [under Section 1782] because the person holding the documents sent them to a lawyer in the United States for advice as to whether they were subject to production." *In re Sarrio*, 119 F.3d at 146; *see also Kiobel*, 895 F.3d at 246.

Kiobel makes clear that, absent the *Fisher* principle, the threat of Section 1782 discovery might cause clients to withhold information from legal counsel, resulting in "bad legal advice to the client, and harm to our system of litigation." *Kiobel*, 895 F.3d at 247. To avoid potential disclosure from Section 1782 applications, U.S. law firms with foreign clients might "be forced to store documents and servers abroad," leading to "excessive costs to law firms and clients." *Id.* "Alternatively, U.S. law firms m[ight] have to return documents to foreign clients (or destroy them) as soon as litigation concludes[,]" despite law firms' "interest in retaining documents where needed to protect themselves from accusations of wrongful conduct." *Id.* Or foreign clients might simply avoid U.S. law firms altogether. *See id.* at 248. *Kiobel* thus confirmed that, to avoid "jeopardiz[ing] [*Fisher*'s] policy" of protecting "attorney-

29

client communications and relations," a district court should ask whether the requested documents are discoverable from the law firm's client—and "should not" grant Section 1782 discovery if they are not. *Kiobel*, at 241, 246 (internal quotation marks omitted).

Importantly, the *Fisher* principle protects documents "regardless of their content." *Ratliff*, 354 F.3d at 170. That is, the documents do not need to be attorney-client or work-product privileged to be protected. *See Kiobel,* 895 F.3d at 246 (distinguishing this "protection" from "attorney-client privilege"). The *Fisher* principle is concerned with discovery that would disrupt the relations between attorney and client; in the Section 1782 context, that includes *any* discovery that could make foreign persons "less willing to engage with U.S. law firms." *Id.* at 248.

This case presents an especially strong basis to hew to the *Fisher* principle: Unlike in *Sarrio*, *Ratliff*, and *Kiobel*—where the client's attorneys on the relevant matters were actually located in the United States—Fortenova's attorneys on the matters in question are based in a foreign jurisdiction (the United Kingdom), and the documents are accessible in the United States only by virtue of shared IT servers. *See Banoka*, 148 F.4th at 70 ("[A] court *** *should*[] consider the location of

30

documents and other evidence when deciding whether to exercise its discretion to authorize [Section 1782] discovery." (quoting *In re del Valle Ruiz*, 939 F.3d 520, 533 (2d Cir. 2019) (first alteration in original)). Permitting discovery in this circumstance "would effectively collapse corporate separations and incentivize companies to maintain segregated computer systems." *Id.* (internal quotation marks and alterations omitted). And as noted, it might "discourage foreign clients from engaging the foreign office of an American law firm for fear that American courts would order production of documents and depositions of attorneys that \*\*\* might not be ordered by the country where the client is located." *In re Hulley Enters., Ltd.*, 358 F. Supp. 3d 331, 353 (S.D.N.Y 2019).

> 2. *The Documents Sought From Akin Are Not Discoverable From Its Foreign Client*

The magistrate judge recognized that "a client generally may obtain documents from its lawyer on demand," and thus that "many of the documents sought by the proposed subpoenas could be demanded by Fortenova Group from [Akin]." SPA-27-29; *see also id.* (noting that when asked, "Petitioner resisted th[is] question"). That was correct: As Akin's client, Fortenova constructively possesses every document the

31

Application seeks from Akin. *See In re Alghanim*, No. 21-MC-167, 2022 WL 1423088, at \*3 (S.D.N.Y. May 5, 2022) ("[D]ocuments in the possession of a party's attorney are deemed to be within the party's possession, custody, or control because the party has the legal right to obtain the documents on demand." (alteration in original) (quoting *In re Mare Shipping Inc.*, No. 13-misc.-238, 2013 WL 5761104, at \*4 (S.D.N.Y. Oct. 23, 2013)); *see Schmitz v. Bernstein Liebhard & Lifshitz, LLP.*, 376 F.3d 79, 85 (2d Cir. 2004) ("Although technically the respondent in the district court was Cravath, for all intents and purposes petitioners are seeking discovery from [Cravath's client] DT, their opponent in the German litigation.").

Because the documents are in Fortenova's (constructive) possession, the district court was required to ask whether the documents are discoverable from Fortenova itself in the foreign proceedings, and to deny the Application if they are not. Importantly, that "foreign-discoverability" inquiry assesses whether the foreign jurisdiction would "*facilitate* investigation of claims by empowering parties to require their adversarial and non-party witnesses to provide information," not merely whether a foreign jurisdiction's rules "*prohibit* the acquisition" of such

32

information. *Mees*, 793 F.3d at 303 & n.20; *see id.* at 303 (explaining that while Section 1782 generally does not authorize denial of an application "solely because such discovery is unavailable in the foreign court," a "determination of discoverability under the laws of the foreign jurisdiction" is proper "in appropriate cases" (citations omitted)).

As indicated by the fact that SBK has resorted to seeking European-focused discovery in New York, none of the relevant foreign jurisdictions permits discovery of documents from Fortenova (or Akin) at the pre-trial stage—regardless of whether any jurisdiction would *also* "prohibit the [documents'] acquisition." The Netherlands "does not have general pre-trial discovery or disclosure regimes." JA-1038-1039, ¶ 41. "No documents can be requested that a party *merely suspects* might provide support for its claim." JA-1041, ¶ 49 (emphasis added). It is likewise "insufficient that the applicant merely speculates about the possible course of events." *Id.* In short, as this Court already recognized in *Kiobel*, "it is hardly possible for a party to obtain evidence from another party pre-trial" in the Dutch courts. 895 F.3d at 245 n.3.

In Malta, SBK cannot obtain from Fortenova any of the discovery the district court authorized SBK to obtain from Akin because SBK's

33

"civil case for damages is currently limited to the preliminary pleas raised by the defendants, including Fortenova." JA-395, ¶ 17. In the Maltese legal system, "[p]reliminary pleas are affirmative defences which are heard *before* reaching the merits," and if the court accepts the affirmative defenses, it will "quash the case before the merits are even heard." *Id.* (emphasis added). SBK thus cannot obtain from Fortenova any evidence relevant to the merits of its claim because "under Article 558 of the Code of Organisation and Civil Procedure, the only evidence that may be filed at this stage of the proceedings is evidence which is relevant to the pleas currently being defended—i.e., the preliminary pleas[.]" JA-395-396, ¶ 19; *see* Code of Organization and Civil Procedure, Art. 558 (1855) (Malta) (JA-722) ("All evidence must be relevant to the matter in issue between the parties.").

Finally, the EU General Court has already rejected SBK's attempt to reverse the EU Council's listing of SBK. *See supra*, pp. 15-16. But in any case, as Petitioner's own expert concedes: "[T]here are no means to compel Fortenova Group STAK Stichting or Akin to disclose evidence" in those proceedings, because the EU Courts do not have the power to "direct disclosure orders against non-parties, such as Fortenova Group

34

STAK Stichting or Akin." JA-1278-1279; *see also Kiobel*, 895 F.3d at 245 n.3 (relying on declaration from petitioner's counsel to conclude petitioner could not compel production of relevant documents under Dutch procedure).

## B. The District Court Erred In Ignoring The *Fisher* Principle

In granting Section 1782 discovery to SBK, the district court erred in concluding that *Kiobel*—including its articulation of the *Fisher* principle in the Section 1782 context—permitted discovery here. The district court artificially cabined *Kiobel* to its facts (without appreciating the factual overlaps with this case), failed to recognize that the *Fisher* principle extends beyond attorney-client privileged/work-product protected documents, and created a "lobbying" loophole that threatens to undermine the principle. Both the district court and the magistrate judge thus declined to consider whether the requested documents were discoverable from Fortenova abroad. *See* SPA-34 ("Section 1782 does not have a 'foreign-discoverability rule'"); SPA-64-65 ("[A] district court

35

should not consider the discoverability of the evidence in the foreign proceeding." (emphasis omitted)).[7]

These legal errors constitute an abuse of discretion. *See Ratliff*, 354 F.3d at 168. Because the documents are not discoverable from Fortenova, *see supra*, pp. 31-35, this Court should reverse.

1. *The District Court Erred In Narrowing* Kiobel *To Its Facts*

The district court erred first in viewing *Kiobel* as limited to a unique set of facts that the district court did not believe were present here. For instance, the district court characterized *Kiobel* as centrally concerned with the use of Section 1782 to end-run a protective order. SPA-72-73. But *Kiobel* was *also* plainly concerned with the use of Section 1782 to interfere with attorney-client relations, imposing excessive costs on law

---

[7] In a footnote in its stay order, the district court stated that it and the magistrate judge had each considered foreign discoverability in assessing SBK's Section 1782 application. JA-2075, n.3. But respectfully, the magistrate judge and district court considered only Akin's related argument regarding whether the relevant jurisdictions' laws would affirmatively *prohibit* the discovery and use of such information, not whether those jurisdictions offered any means to obtain it (*i.e.*, the key question under *Fisher* and *Kiobel*). *See, e.g.,* SPA-64 ("Akin is mistaken that § 1782 requires the materials sought by the Petition to be discoverable under Malta and EU Law."); *see supra*, pp. 26-31.

firms, and deterring clients from hiring U.S. law firms. *See supra*, pp. 28-30. Indeed, at least one court has described the latter concern as *Kiobel*'s "primary" one. *See In re Warren*, No. 20-misc-208, 2020 WL 6162214, at \*10 (S.D.N.Y. Oct. 21, 2020) ("[T]he *primary* concern that motivated the *Kiobel* court—that documents of a foreign entity would become discoverable under Section 1782(a) solely because they were produced by the foreign entity to its U.S. counsel in connection with U.S. litigation—is present here, and counsels that this Court's June 11, 2020 Order should be vacated." (emphasis added)). Put another way, "the policy considerations in *Kiobel* pertained not only to 'the respect owed to confidentiality orders,' but also to 'the concerns for lawyer-client relations' more generally[.]" *In re Hulley Enters. Ltd.*, 400 F. Supp. 3d 62, 75 (S.D.N.Y. 2019). The magistrate judge herself recognized "the very real policy concerns raised by the Second Circuit" that Section 1782 subpoenas could "chill communications between lawyers and their clients and discourage clients from hiring the foreign office of American law firms." SPA-40-41. Nor was that concern a one-off in *Kiobel*; it has been repeatedly raised in this Court's cases addressing Section 1782's

37

application to law firms. *See In re Sarrio*, 119 F.3d at 146; *Ratliff*, 354 F.3d at 169-170. Neither case involved a protective order.

The district court also suggested that *Kiobel* was inapposite because the documents subject to SBK's application were produced or obtained by Akin independent of Fortenova. *See* SPA-74. But the relevant question is whether the requested documents belong to the law firm's client, and if so, whether they are discoverable from the client. Whatever the documents' origin, the principle remains the same: if a client is not required to produce a document belonging to it, the client's legal counsel should not be, either. *Kiobel*, 895 F.3d at 246; *Fisher*, 425 U.S. at 404.

Finally, the district court suggested that this Court had reversed the district court's grant of discovery in *Kiobel* because other *Intel* factors weighed against granting discovery as well. SPA-69-70. The district court pointed out that in *Kiobel* "'the real party' from whom documents were sought *** was 'involved in foreign proceedings'" and so the need for Section 1782 help was not apparent. SPA-70. But "'the real party' from whom documents [a]re sought" in this case—Fortenova—is similarly involved in several of the foreign proceedings. SPA-29; *see supra*, pp. 19-

38

20. The district court also found it relevant that, unlike in *Kiobel,* SBK's "Petition does not seek *any* documents prepared for U.S. litigation." SPA-73. But that fact should have counseled *against* discovery—unlike in *Kiobel*, the London-based documents sought by the Application are not related to the United States *at all*.

The district court further noted that the "Netherlands' more restrictive discovery practices" had militated against Section 1782 discovery in *Kiobel*. SPA-70. But those "more restrictive discovery practices" were simply procedures that failed to *facilitate* expansive pre-trial discovery—the same as here. *See Kiobel*, 895 F.3d at 245 n.3 ("[W]hile Kiobel may 'request' copies of documents from Shell under section 843a of the Dutch Code of Civil Procedure, 'it is hardly possible for a party to obtain evidence from another party pre-trial' in the Netherlands."); *see also In re Accent Delight Int'l Ltd.*, No. 16-MC-125, 2018 WL 2849724, at *4 (S.D.N.Y. June 11, 2018) ("[R]estrictions on the availability and timing of depositions and on broad requests for 'all' documents and communications" are "*limits* on the scope of discovery in those fora, *not* 'proof-gathering *restrictions*.'" (emphases added)), *aff'd*, 791 F. App'x 247 (2d Cir. 2019). Those are exactly the type of foreign

39

discoverability rules the district court wrongly believed it should not consider here.

### 2. *The* Fisher *Principle Is Not Limited To Attorney-Client Privileged Documents*

The district court further erred in failing to recognize that the *Fisher* principle extends protections beyond privileged attorney-client materials—namely, to all client documents in a law firm's possession. The district court reasoned that even if SBK's application "implicated *Kiobel*'s policy concern that discovery from law firms would chill attorney-client communications," that concern was addressed by the magistrate judge's limitation of discovery to "non-privileged" materials "closely tailored to SBK's litigation needs." SPA-74. But this Court has expressly distinguished between attorney-client privileged materials and "the protection discussed in *Sarrio* that would protect documents *regardless of their content*." *Ratliff*, 354 F.3d at 170 (emphasis added); *see also Kiobel*, 895 F.3d at 246 (same). The documents at issue in *Kiobel* were not attorney-client privileged; they were simply undiscoverable from the client due to both a protective order and limits on pre-trial discovery under Dutch law. *See Kiobel*, 895 F.3d at 244. This Court nonetheless reversed the district court's grant of discovery.

40

That makes sense in light of *Fisher*'s policy concerns. Excluding only those documents that are attorney-client or work-product privileged leaves a vast array of documents to be obtained under Section 1782 from a client's attorney, at the expense of "attorney-client communications and relations." *Kiobel*, 895 F.3d at 246. Attorney-client privileged documents, after all, are limited to communications between clients and their attorneys. *ACLU v. National Sec. Agency*, 925 F.3d 576, 589 (2d Cir. 2019). And attorney work-product documents are limited to those created in anticipation of litigation. *American Oversight v. United States Dep't of Just.*, 45 F.4th 579, 590 (2d Cir. 2022).

But a legal counsel's role does not begin or end with client communications or litigation. As the American Bar Association has recognized, "[a]s a representative of clients, a lawyer performs various functions." AM. BAR. ASS'N, MODEL RULES OF PROFESSIONAL CONDUCT, Preamble (2024). For example, "[a]s advisor, a lawyer provides a client with an informed understanding of the client's legal rights and obligations and explains their practical implications." *Id.* "As negotiator, a lawyer seeks a result advantageous to the client but consistent with requirements of honest dealings with others." *Id.* And "[a]s an evaluator,

41

a lawyer acts by examining a client's legal affairs and reporting about them to the client or to others." *Id.*

Numerous documents created by Akin in its role as a legal advisor, negotiator, or evaluator for Fortenova thus risk disclosure if they are deemed to be neither attorney-client privileged nor attorney work product. For example, in its latest subpoena, SBK requests "[a]ll Documents concerning or relating to" (1) the purported transfer of SBK to Mr. Alketbi, (2) the Corporate Changes, or (3) the Akin Opinion. JA-1528; *see also* JA-1521-1522 (defining "Documents" expansively). So any internal notes or memoranda created by Akin in the course of counseling Fortenova on the legal requirements or implications of the Corporate Changes, or any working papers or internal emails created by Akin in the course of evaluating whether the purported transfer of SBK to Mr. Alketbi exposed its client to legal peril, are at risk of discovery. Such papers constitute quintessential legal work—prepared or obtained in connection with advising Fortenova on its legal rights, obligations, and risks given the presence of a sanctioned entity within its ownership structure—that are undiscoverable from Fortenova itself. Yet SBK has nonetheless been given the green light to try to obtain these sensitive

42

materials from Fortenova's legal counsel, in disregard of the implications for Akin's relationship with Fortenova and the deterrent effect such a decision will have on the decision to hire legal counsel with American ties in the future.

### 3. The District Court's "Lobbying" Exception Undermines The Fisher Principle

The district court also erroneously reasoned that *Kiobel* did not apply because, in its view, the requested documents related to lobbying, not legal work. In so concluding, the district court appeared to rely primarily on the allegation that Fortenova provided the Akin Opinion "to a Dutch court to contest [SBK]'s right to exercise its voting rights [in Fortenova] and possibly also to the EU Council in connection with the Council's consideration of whether to sanction [SBK]." SPA-46; *see* SPA-59. The district court viewed such "offensive[]" use of the Akin Opinion as evidence of lobbying. SPA-73. But there can be little doubt that the Akin Opinion first and foremost is a legal opinion, expounding on "the applicable legal provisions of EU sanctions regulations, the relevant provisions of Dutch criminal law, [and] the relevant provisions of EU and Dutch anti-money laundering *** legislation," in order to advise Fortenova about whether it was legally safe to allow SBK to exercise its

43

shares in Fortenova. JA-149, JA-153, JA-173-176. Indeed, the EU General Court itself recently described the Akin Opinion as "[a] *legal* opinion." EU General Court Op. ¶ 154 (emphasis added).

Lobbying, by contrast, is typically understood as an attempt to "persuade a government official, such as a legislator, usu[ally] repeatedly or frequently, in an attempt to influence some action proposed to be taken." *Lobby*, BLACK'S LAW DICTIONARY (12th ed. 2024). Submitting a legal opinion to "a Dutch *court*" is legal advocacy, not lobbying. SPA-46 (emphasis added). Nor is the Akin Opinion targeted to government action. Even though SBK claims it was used to influence the EU Council's decision to list SBK, the Opinion came to no conclusive determination as to SBK's ultimate ownership, advising instead that Fortenova should seek additional information. JA-150. Indeed, in its opinion denying SBK's application to reverse the EU Council's sanctions designation, the EU General Court described the Akin Opinion as "of little evidential value." EU General Court Op. ¶ 154. And to top it off, SBK alleges the EU Council obtained the Akin Opinion "only through the Fortenova management"—*i.e.*, not from Akin. SPA-53. In fact, none of the relevant timekeepers was even registered to lobby in the United

Kingdom or European Union, as the rules of those jurisdictions require. *See supra*, p. 15.[8]

Even accepting *arguendo* that the Akin Opinion was transformed into a lobbying document via disclosure to a Dutch court or the EU Council, Petitioner's expansive requests for "All Documents" related to not just the Akin Opinion, but also Mr. Altekbi's purported acquisition of SBK and the Corporate Changes, illustrate the problem with creating an ill-defined "lobbying" exception to the *Fisher* principle. There is no dispute that Akin performed extensive legal work for Fortenova. In the context of traditional attorney-client privilege, "communications regarding legal advice or services *** do not lose their protection merely because they are given by a lawyer who also performs lobbying services."

---

[8] To be sure, the district court noted that Akin is registered as a Fortenova lobbyist *in the United States*. But as Akin's general counsel stated in a sworn declaration, during the relevant period, only two U.S.-based Akin timekeepers in Akin's U.S. Public Law & Policy practice billed just 27.4 hours in total to matters for Fortenova, and a portion of even that small amount of work was legal, not lobbying, in nature. JA-1446, ¶ 12. "None of the work performed by either of these timekeepers related, in any way, to the EU Council's decision to designate SBK; rather, the work was to assist Fortenova in obtaining necessary licenses from the United States Office of Foreign Assets Control and the United States Department of Treasury because of certain entities in its capital structure, including SBK, subject to US blocking sanctions." *Id.*

45

*Robinson v. Texas Auto. Dealers Ass'n*, 214 F.R.D. 432, 445 (E.D. Tex. 2003), *vacated in other part sub nom.*, *In re Texas Auto Dealers Ass'n*, No.03-40860, 2003 WL 21911333, at \*1 (5th Cir. July 25, 2003). Yet, the district court authorized, for example, discovery of documents that relate to the Corporate Changes—a corporate restructuring that was voted on in January 2023, *after* the Akin Opinion was issued. SPA-4-5; SPA-52. And the district court accepted that the relevant period for document production should run for *another year* following issuance of the Akin Opinion, until December 31, 2023. SPA-43. SBK has presented no theory as to how Akin's role in providing legal counsel to Fortenova on corporate governance and restructuring—advice no less legal in nature than that provided by any corporate restructuring attorney—could possibly constitute lobbying, yet the district court nonetheless authorized presumptive discovery related to that counsel.

As things stand, if the district court simply accepts an applicant's allegations of lobbying, applicants will have an easy way to circumvent the *Fisher* principle. *Compare* SPA-19 (noting that "the materials *may* show that Akin engaged in lobbying on behalf of Fortenova Group to convince the EU Council unfairly to declare Petitioner a sanctioned

46

entity"), *with* JA-1510, ¶ 8 (explaining that no relevant Akin timekeeper was qualified to perform lobbying services in the European Union or United Kingdom). If the district court makes a broad-based determination that lobbying possibly occurred based on undefined criteria, foreign clients can have no assurance that their engagement of U.S. law firms to provide legal counsel will not ensnare them in Section 1782 discovery. Foreign clients will be forced to predict—with little guidance or guarantees—exactly when their lawyers' work will move from the undiscoverable to discoverable. Even if a court requires document-by-document review to determine whether a document is better categorized as lawyering or lobbying, clients (and their law firms) will be forced to undergo a tedious and expensive exercise, while still facing substantial risk that some of those documents will be produced in a way that undermines the clients' reasonable expectations to the contrary (and thus a substantial risk that foreign clients will instead eschew law firms with a U.S. presence). Either outcome is wholly inconsistent with *Fisher* and this Court's precedent.

47

***

Because the requested evidence was not discoverable from Fortenova abroad, this Court should reverse the district court's grant of SBK's Application.

## II. AT A MINIMUM, THE DISTRICT COURT'S FAILURE TO TAKE ACCOUNT OF EXTRATERRITORIALITY CONSIDERATIONS REQUIRES VACATUR AND REMAND

Even if the *Fisher* principle does not automatically protect the documents SBK seeks from Akin, this Court's recent decision in *Banoka* confirms that extraterritoriality factors—including the foreign location of the documents and their custodians—are at least *relevant* to the exercise of a court's discretion in deciding whether to grant a Section 1782 application. That is particularly true where, as here, the non-U.S. office of a law firm is targeted due to its foreign representation of a foreign client concerning a foreign matter, for documents that could not be obtained via the procedural rules of those foreign jurisdictions. The district court erred in failing adequately to take account of such extraterritoriality considerations in deciding to grant SBK's Application.

In *Banoka*, this Court stressed that, under the fourth *Intel* factor, "[a] court may properly, *and in fact should*, consider the location of

48

documents and other evidence when deciding whether to exercise its discretion to authorize [Section 1782] discovery." 148 F.4th at 70 (quoting *In re del Valle Ruiz*, 939 F.3d at 533). It noted that this Court "ha[s] reversed a district court for failing to consider precisely such concerns." *Id.* Crucially, the fact that the documents in *Banoka* were practically accessible in the United States via the respondents' shared IT servers was insufficient to deem them U.S.-located. Instead, "consider[ing] the foreign location of the documents and the foreign status of their 'primary custodian'" was appropriate because doing "otherwise would effectively collapse corporate separations and incentivize companies to maintain segregated computer systems." *Id.* (internal quotation marks and alterations omitted); *see In re Hulley*, 358 F. Supp. 3d at 353 (expressing related fear of "discourag[ing] foreign clients from engaging the foreign office of an American law firm").

Moreover, this Court made clear that it had also approved "consideration of foreign discoverability *** when *** relevant to the § 1782 application" under the third *Intel* factor. *Banoka*, 148 F.4th at 65. In *Banoka*, it was thus appropriate for the district court to account for the fact that it "was 'unlikely' that an English court would allow pre-suit

49

discovery of the requested materials" given the sophisticated parties to a negotiation had agreed to litigate any dispute in the English courts. *Id.* at 67-68. The applicant's targeting of the U.S.-based respondent "was openly an attempt to obtain communications" from the applicant's counterparty indirectly because the applicant could not obtain discovery from the counterparty "directly." *Id.* at 67 & n.12 (alteration omitted).

Such considerations implicate Section 1782's "twin aims of providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts." *Banoka*, 148 F.4th at 64. It seems unlikely that a foreign country's legal system will consider it a boon for a U.S. court to order discovery of documents held by foreign custodians, for a foreign client, regarding a foreign matter, and purportedly needed for foreign proceedings, where their own system does not provide for such discovery. *See In re Hulley*, 358 F. Supp. 3d at 353 (reviewing similar considerations in determining that the requested Section 1782 discovery would not advance Section 1782's aims). Nor is it "efficient" for U.S. courts to order such discovery if doing so will cause U.S. law firms, at considerable expense, to store documents in separate servers located

50

abroad—or if the discovery will lead foreign clients simply to stop hiring law firms with U.S. offices altogether.

Yet the district court did not consider the foreign location of the documents and their primary custodians, and it suggested there was an outright prohibition on its consideration of whether the documents were discoverable under the procedures of the foreign jurisdictions. SPA-64-65 ("Just 'as a district court should not consider the discoverability of the evidence in the foreign proceeding, it should not consider the admissibility of evidence in the foreign proceeding in ruling on a section 1782 application.'" (emphasis omitted) (quoting *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 81 (2d Cir. 2012)). While it is true that foreign discoverability is not a relevant factor in deciding Section 1782's *statutory* "for use" factor, *Brandi-Dohrn*, 673 F.3d at 81, *Banoka* makes clear that it may be appropriate—"and in fact" "instruct[ive]"—for a district court to consider foreign discoverability under *Intel*'s discretionary analysis, 148 F.4th at 66-69.

The district court erred in failing to consider the foreign location and discoverability of the foreign documents. *See Ratliff*, 354 F.3d at 168. If this Court does not reverse the district court's decision, it should at

51

least vacate and remand with instructions that such extraterritorial considerations—including the question of whether the documents are discoverable from Fortenova in the foreign proceedings—are relevant to the district court's inquiry and should be considered.

## CONCLUSION

Because the requested documents are not discoverable from Fortenova, this Court should reverse the district court's grant of Section 1782 discovery of those same documents from Akin.

Respectfully submitted,

| | |
|---|---|
| | */s/ James E. Tysse* |
| Anne M. Evans | James E. Tysse |
| Sean M. Nolan | Lide E. Paterno |
| Daniel W. Slemmer | Kristen E. Loveland |
| AKIN GUMP STRAUSS HAUER | AKIN GUMP STRAUSS HAUER |
|   & FELD LLP |   & FELD LLP |
| One Bryant Park | 2001 K Street, NW |
| New York, NY 10036 | Washington, DC 20006 |
| (212) 872-1000 | (202) 887-4000 |
| | jtysse@akingump.com |

*Counsel for Respondent-Appellant*

September 25, 2025

52

## CERTIFICATE OF COMPLIANCE

The foregoing brief is in 14-point Century Schoolbook proportional font and contains 9,757 words as determined by Microsoft Word, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rule of Appellate Procedure, and thus complies with the typeface, typestyle, and type-volume requirements set forth in Rule 32(a)(5)-(7)(B) of the Federal Rules of Appellate Procedure.

*/s/ James E. Tysse*
James E. Tysse

September 25, 2025

**SPECIAL APPENDIX**

# SPECIAL APPENDIX

# TABLE OF CONTENTS

Report and Recommendation of United States Magistrate Judge
Robyn F. Tarnofsky, dated July 30, 2024 (ECF No. 46)....................SPA-1

Opinion and Order of District Judge Paul A. Engelmayer, dated
May 30, 2025 (ECF No. 57) ...........................................................SPA-50

28 U.S.C. § 1782 ...........................................................................SPA-78

i

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE EX PARTE APPLICATION OF SBK ART LLC, Petitioner,<br><br>for an Order Pursuant to 28 U.S.C. § 1782 To Take Discovery for Use in Foreign Proceedings. | CIVIL ACTION NO. 24-MC-0147 (PAE) (RFT)<br><br>**REPORT AND RECOMMENDATION** |

**TO THE HONORABLE PAUL A. ENGELMAYER, UNITED STATES DISTRICT JUDGE:**

On March 26, 2024, SBK ART LLC ("Petitioner") submitted an ex parte Application and Petition (the "Application") pursuant to 28 U.S.C. § 1782 for an order authorizing Petitioner to serve subpoenas on Akin Gump Strauss Hauer & Feld LLP and Akin Gump LLP (together, Respondents or "Akin") to obtain discovery for use in: (1) a pending lawsuit filed in the Civil Court of Malta (the "Malta Action"), (2) anticipated litigation in the Netherlands (the "Anticipated Litigation"), and (3) a pending action in front of the General Court for the European Union (the "EU Action") (together, the "Foreign Proceedings"). (*See* ECF 1, Petition; ECF 8, Motion.) Having reviewed Petitioner's and Respondents' submissions, for the reasons set forth below, I respectfully recommend that the Application be GRANTED, with the proposed subpoenas revised as set forth herein;[1] to the extent that, upon undertaking the document

---

[1]    "Until recently, the consensus view in this District was that 'rulings on § 1782 applications are not dispositive,' and therefore that such an application could be disposed by order of the Magistrate Judge to whom it was referred . . . ." *In re Libyan Asset Recovery and Mgmt. Office*, No. 21 Misc. 0852 (JGK) (BCM), 2023 WL 8445811, at *1 n.1 (S.D.N.Y. Nov. 16, 2023) (quoting *In re Hulley Enters. Ltd.*, 400 F. Supp. 3d 62, 71 (S.D.N.Y. 2019)). However, in *Associacão dos Profissionais dos Correios v. Bank of N.Y. Mellon Corp.*, No. 22-2865, 2023 WL 3166357 (2d Cir. Mar. 28, 2023), a panel of the Second Circuit decided that it lacked jurisdiction to review the order issued by a Magistrate Judge denying an application under Section 1782 and remanded so that the order could be "treated as a report and recommendation." 2023 WL 3166357, at *1. While the Second Circuit did not explain its reasoning, the theory would be that

1

**SPA-1**

production, Akin concludes that compliance would be overly burdensome, it may come back to the Court after engaging in a meet-and-confer process.

## BACKGROUND

### I.    Factual Background

Fortenova Grupa d.d. ("Grupa"), a Croatian food and retail company, is held by a series of Dutch holding companies (the "Fortenova Group"), with Fortenova Group STAK Stichting ("STAK") at the top of the corporate structure. (*See* ECF 3, Michael A. Piazza Declaration ("Piazza Decl.") Ex. B (Fortenova Group Structure).) Petitioner claims it is the rightful owner of an approximately 42% interest in Grupa through Petitioner's ownership of depositary receipts issued by STAK ("STAK DRs"). (*See id.*)

Petitioner acquired its STAK DRs in April 2022 from the Russian bank PJSC Sberbank of Russia ("Sberbank"), which was the majority owner of Petitioner at the time. (*See* ECF 3, Piazza Decl. Ex. D (Article).) After the beginning of the war in Ukraine, Sberbank was sanctioned by the United States, the United Kingdom, and the European Union ("EU"). Thereafter, Sberbank sold its stake in Petitioner to Saif J.S.M. Alketbi ("Mr. Alketbi"), a businessman from the United Arab Emirates. (*See* ECF 13, Unredacted Versions of Proposed Sealed Documents in Support of Application (Ex. 1, Petitioner's Mem. at 5).)

The second largest minority owner of Grupa is a Maltese company, Open Pass Limited ("Open Pass") (*see* ECF 3, Piazza Decl. Ex. B (Fortenova Group Structure)), which is controlled by

_____

the entire purpose of a Section 1782 petition is to seek discovery, so that any decision regarding whether discovery may proceed is dispositive. I therefore make a report and recommendation on the Application rather than issuing an opinion and order.

2

Mr. Pavao Vujnovac ("Mr. Vujnovac"). (*See* ECF 13 Ex. 1, Petitioner's Mem. at 2.) Starting in 2019, Mr. Vujnovac began acquiring STAK DRs, which Petitioner says was part of a plan to gain control of Grupa; in 2021, he established Open Pass and transferred into it all or most of the STAK DRs he owned at the time. (*See id.* at 6-7.) Petitioner asserts that Mr. Vujnovac used the sanctions against Sberbank to advance his plan to gain control of Grupa. (*See id.*)

Akin is "an American multinational law firm with offices throughout the US and across the globe." (ECF 22, Respondents' Opp. at 4.) In recent years, Akin's London office has been lead English law counsel to Fortenova Group on most of its matters, "including (since 2022) in connection with issues arising from the presence of sanctioned holders in its capital structure." (ECF 23, Declaration of Liz Osborne in Opposition to Petition ("Osborne Decl.") ¶ 6.) In addition to serving as Fortenova Group's English law legal counsel, Akin is also a registered lobbyist for Fortenova Group and has done some work lobbying in the U.S. for Fortenova Group. (*See* ECF 41, Second Declaration of Robert Pees in Opposition ("Second Pees Decl.") ¶¶ 12-13.)

Petitioner contends that after its sale to Mr. Alketbi, Open Pass began a smear campaign against him while at the same time encouraging Croatian officials to lobby EU officials to have Petitioner sanctioned in the EU. (*See* ECF 13 Ex. 1, Petitioner's Mem. at 6-8.) In particular, Petitioner claims that on December 14, 2022, it received documents that STAK had provided to a Dutch court to contest Petitioner's right to exercise its voting rights in STAK. (*See id.*) Those documents included an opinion issued by Akin (the "Akin Opinion") stating that documents provided by Mr. Alketbi explaining his acquisition of Petitioner were: "insufficient to confirm that the transaction under review [has] resulted in SBK [ART] no longer being subject to the asset freeze restrictions imposed on its purported (former) parent company Sberbank"; and

3

**SPA-3**

"indicative of criminal sanctions breaches having been committed by EU persons in relation to the transaction under review." (*Id.* at 7.) The Akin Opinion listed documents necessary to analyze Mr. Alketbi's acquisition of Petitioner. The listed documents had already been requested by STAK from Mr. Alketbi, which leads Petitioner to conclude that Akin was advising STAK in connection with STAK's review of Mr. Alketbi's acquisition of Petitioner and that STAK had instructed Akin to "assist in a plan to deny Mr. Alketbi his voting and ownership rights." (*Id.*) On December 16, 2022, Petitioner was added to the EU list of sanctioned entities. (*See id.* at 7-8.)

Petitioner believes that Respondents lobbied the EU Council to sanction Petitioner. (*See* ECF 42, Petitioner's Response ("The petition, at its core, seeks records relating to Akin's work done in connection with coming to the conclusions in the Akin Opinion, and its efforts to advocate on behalf of Fortenova (and regarding SBK ART) before . . . the EU Council.").) And it appears that the EU Council somehow obtained a copy of the Akin Opinion. (*See Id.* at 2 (stating that the EU Council turned over a copy of the Akin Opinion in connection with discovery in the EU Action).) According to Petitioner: "Taking into account the short period of time between the issuance of the Akin Opinion (14 December 2022) and the date of introduction of sanctions against SBK ART on the basis, among other things, of the Akin Opinion (16 December 2022), the Akin Opinion could have ended up with the Council of the EU only through the Fortenova Group's management." (ECF 13 Ex. 1, Petitioner's Mem. at 8.)

On January 12, 2023, STAK held a meeting of the STAK DR Holders about the proposed changes to the corporate governance of the Fortenova Group ("Corporate Changes"), which were approved based on Open Pass's votes in favor; Petitioner, as a sanctioned entity, was not

**SPA-4**

permitted to vote, and two-thirds of the remaining STAK DR Holders (other than Open Pass) voted against the Corporate Changes. (*See id.* at 9; ECF 13 Ex. 4, Action for Annulment ¶ 74.)

Having secured control of Grupa as a result of the Corporate Changes, Open Pass then arranged for the sale of the Dutch holding company, Fortenova Group MidCo B.CV. ("MidCo"), which indirectly held all of Grupa's shares, at an artificially low price, to benefit Open Pass and harm Grupa's other owners, including Petitioner. (*See* ECF 3, Piazza Decl. Ex. G (Article); ECF 13 Ex. 1, Petitioner's Mem. at 9-12.)

## II.    Procedural History

On March 26, 2024, Petitioner submitted its Application pursuant to 28 U.S.C. § 1782 for an order authorizing Petitioner to serve subpoenas on Akin for use in the Foreign Proceedings. (*See* ECF 8, Motion; ECF 13 Ex. 1, Petitioner's Mem.; ECF 3, Piazza Decl.; ECF 13 Ex. 3, Declaration of Dr. Gabriel Lansky in Support ("Lansky Decl."); ECF 5, Declaration of John Refalo in Support ("Refalo Decl.").)[2] The previous day, Petitioner had submitted an application seeking discovery from Kroll LLC ("Kroll") (the "Kroll Application"), which matter was referred to me for general pretrial supervision and dispositive motions. On April 3, 2024, the Court referred this matter to me for general pretrial supervision and dispositive motions as well. (*See* ECF 14, Order.)

---

[2]    Petitioner's Memorandum of Law and Exhibit 1 thereto (ECF 6) and the Lansky Declaration and Exhibit 2 thereto (ECF 4) were filed in redacted form. Petitioner filed a motion to seal on March 28, 2024 along with unredacted versions of the proposed sealed documents. (*See* ECF 11, Mot. To Seal; ECF 12, Mem. in Support of Mot. To Seal; ECF 13, Unredacted Versions of Proposed Sealed Documents in Support of Application.) On April 18, 2024, I granted Petitioner's motion to seal. (*See* ECF 16, Order.)

On April 18, 2024, I ordered Petitioner to serve Akin with the Application and supporting papers and set deadlines for Akin's response to the Application, if any, and for Petitioner's reply, if any. (*See* ECF 17, Order.) On April 22, 2024, this case was accepted as related to the Kroll Application.

On May 5, 2024, after having been informed by Petitioner on April 15, 2024 that "Kroll will not oppose the issuance of the subpoena under 28 U.S.C. § 1782 but reserves its right to object to the resulting subpoena under any grounds available and appropriate under Fed. R. Civ. P. 45," *See In Re: SBK ART LLC,* No. 24-MC-0142 (PAE) (RFT), ECF 11, Letter at 1 n.1, I issued a report and recommendation on the Kroll Application, recommending that Petitioner's application to take discovery from Kroll be granted.[3]

On May 6, 2024, Akin filed a response in opposition to the Application with supporting papers. (*See* ECF 22, Respondents' Opp.; ECF 23, Osborne Decl.; ECF 24, Declaration of Ross Denton in Opposition ("Denton Decl."); ECF 25, Declaration of Daniel Buttigieg in Opposition ("Buttigieg Decl."); ECF 26, Declaration of Christiaan Zijderveld in Opposition ("Zijderveld Decl."); ECF 27, Declaration of Robert Pees in Opposition ("Pees Decl.").)

On May 31, 2024, Petitioner filed under seal its reply in further support of the Application. (*See* ECF 33, Petitioner's Reply; ECF 33-1, Declaration of Robert S. Landy in Further Support ("Landy Decl."); ECF 33, Petitioner's Reply Ex. 1, Second Declaration of Dr. Gabriel Lansky in Support with Exhibit ("Second Lansky Decl."); ECF 33, Petitioner's Reply Ex. 2,

---

[3]     On May 17, 2024, Kroll filed a request for an extension of time to file objections to my report and recommendation until after a decision on the Application in this action. *See In Re: SBK ART LLC,* No. 24-MC-0142 (PAE) (RFT), ECF 18, Letter Mot. That request was granted. *See In Re: SBK ART LLC,* No. 24-MC-0142 (PAE) (RFT), ECF 20.

**SPA-6**

Declaration of Ali Al-Karim in Support ("Al-Karim Decl."); ECF 33, Petitioner's Reply Ex. 3, Declaration of Elbert Jan Hendrik Zandbergen ("Zandbergen Decl."); ECF 33, Petitioner's Reply Ex. 4, Second Declaration of John Refalo ("Second Refalo Decl.").).)[4]

On July 1, 2024 and July 8, 2024, I issued orders requesting further briefing on certain topics. (*See* ECF 35, 7/1/2024 Order; ECF 36, 7/8/2024 Order.) Petitioner made a supplemental filing on July 11, 2024 (*see* ECF 37, Petitioner's Response, attaching Second Declaration of Robert S. Landy ("Second Landy Decl.") and Third Declaration of Dr. Gabriel Lansky ("Third Lansky Decl.")); Respondents filed their supplemental response on July 17, 2024 (*see* ECF 38, Respondents' Response; ECF 39, Second Declaration of Ross Denton ("Second Denton Decl."); ECF 40, Declaration of Richard Hornshaw ("Hornshaw Decl."); ECF 41, Second Pees Decl.). Petitioner filed a supplemental response on July 19, 2024 (*see* ECF 42, Petitioner's Supp. Response).[5] I held oral argument on July 23, 2024.

### III.    The Application

Petitioner seeks discovery – documents and depositions – from Akin in connection with three matters: (1) the Malta Action, which is a suit by Petitioner against Open Pass and Fortenova Group for damages caused to Petitioner by the approval of the Corporate Changes; (2) the Anticipated Litigation, which is a claim that Petitioner intends to file in the Netherlands or another foreign court outside the United States to seek damages caused by the MidCo Sale;

---

[4]    Petitioner also filed an unsealed redacted version of the sealed filing. (*See* ECF 34, Reply; ECF 34-1, Landy Decl.; ECF 34 Ex. 1, Second Lansky Decl.; ECF 34 Ex. 2, Al-Karim Decl.; ECF 34 Ex. 3, Zandbergen Decl.; ECF 34 Ex. 4, Second Refalo Decl.)

[5]    A redacted version of Respondents' Response (ECF 42) was filed at ECF 43.

7

**SPA-7**

and (3) the EU Action, in which Petitioner is seeking to annul the EU Council's decision to list Petitioner as a sanctioned entity. (*See* ECF 13 Ex. 1, Petitioner's Mem. at 2-3.)

Petitioner seeks production of non-privileged documents on the following topics, dating from January 1, 2019 through the present: (1) Mr. Alketbi's acquisition of Petitioner, the Corporate Changes, and Mr. Vujnovac's ownership and/or control over the Fortenova Group, including but not limited to communications about those topics between Akin and a list of enumerated individuals and entities; (2) Akin's lobbying efforts on behalf of the Fortenova Group in the United States, the United Kingdom, or the EU; and (3) communications between Akin and the U.S. Department of Treasury's Office of Foreign Assets Control, the U.S. State Department, the Dutch Ministry of Finance, the U.K. Office of Financial Sanctions Implementation, the National Bank of Serbia, Croatian government officials and staff, and EU officials and staff. (*See* ECF 3, Piazza Decl. Ex. H (Proposed Document Subpoena) at 2, 11-13.)

Petitioner seeks testimony from Akin about: (1) its role and responsibilities in analyzing Mr. Alketbi's acquisition of Petitioner; (2) its role, responsibilities, and lobbying efforts on behalf of the Fortenova Group in the United States, the United Kingdom, the EU, or before any other relevant authority, including the U.S. Department of Treasury's Office of Foreign Assets Control, the U.S. State Department, the Dutch Ministry of Finance, the U.K. Office of Financial Sanctions Implementation, the National Bank of Serbia, Croatian government officials and staff, and EU officials and staff; (3) the support for its conclusion in the Akin Opinion that Sberbank effectively controls Petitioner; (4) other information related to the Akin Opinion; (5) information provided to Akin concerning Mr. Alketbi's acquisition of Petitioner, the Corporate Changes, and Mr. Vujnovac's ownership and/or control over the Fortenova Group; (6)

8

**SPA-8**

communications between Akin and a list of enumerated individuals and entities concerning Mr. Alketbi's acquisition of Petitioner, the Corporate Changes, and Mr. Vujnovac's ownership and/or control over the Fortenova Group; and (7) Akin's document production. (*See* ECF 3, Piazza Decl. Ex. H (Proposed Deposition Subpoena) at 7-10.)

Petitioner argues that the requested discovery will provide evidence of a "scheme that culminated in the sham transaction approved on December 19, 2023, stripping SBK ART of its Fortenova Group ownership interests" and "of lobbying efforts taken by or on behalf of Fortenova Group to preclude SBK ART from exercising their DR voting rights," which issues will be adjudicated in the Foreign Proceedings. (*See* ECF 13 Ex. 1, Petitioner's Mem. at 18.)

## DISCUSSION

### I.    Legal Standard

Under 28 U.S.C. § 1782(a), a federal district court may order any person who "resides or is found" in the district "to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . upon the application of any interested person." Under the statute, the party making the application must show that: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign or international tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *In re Guo*, 965 F.3d 96, 102 (2d Cir. 2020) (quoting *Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir. 2015) (alterations, internal quotation marks, and citations omitted)).

When the statutory requirements are met, the court is "free to grant discovery in its discretion." *In re Optimal Inv. Servs., S.A.,* 773 F.3d 456, 460 (2d Cir. 2014). Although that

9

discretion is broad, it "must be exercised in light of the twin aims of the statute: providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Mangouras v. Boggs*, 980 F.3d 88, 97 (2d Cir. 2020) (internal quotation marks and citations omitted).

The Supreme Court has identified four discretionary factors (the "*Intel* Factors") that a court considers when ruling on a Section 1782 application: "(1) whether the person from whom discovery is sought is a participant in the foreign proceeding, in which case the need for § 1782(a) aid generally is not as apparent; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the request is unduly intrusive or burdensome." *Id.* at 97-98 (citing *Mees*, 793 F.3d at 298 and *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-65 (2004)).

The fourth *Intel* Factor – whether the request is "unduly intrusive or burdensome" – is measured by the standards of Rule 26 of the Federal Rules of Civil Procedure. *See In re XPO Logistics, Inc.*, No. 15-MC-0205 (LGS), 2017 WL 6343689, at *4 (S.D.N.Y. Dec. 11, 2017) (citing *Mees*, 793 F.3d at 303). As applied to Section 1782 applications, Rule 26 "contemplate[s] that discovery requests be tailored to seek information relevant to the parties' claims and defenses and proportional to the needs of the case." *Associacão dos Profissionais dos Correios v. Bank of N.Y. Mellon Corp.*, No. 22-MC-0132 (RA) (KHP) ("*Correios*"),

**SPA-10**

2022 WL 4955312, at *8 (S.D.N.Y. Oct. 4, 2022), *remanded on other grounds*, 2023 WL 3166357 (2d Cir. Mar. 28, 2023). The "proportionality analysis depends on the relevance of the information sought – and, in the case of a § 1782 petition, relevance is assessed with regard to the foreign proceeding." *In re Catalyst Managerial Servs., DMCC*, 680 F. App'x 37, 39 (2d Cir. 2017).

The Second Circuit has instructed that "it is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright." *Mees*, 793 F.3d at 302 (internal quotation marks and citation omitted). Thus, where the court finds that discovery sought under Section 1782 is overbroad, "before denying the application it should ordinarily consider whether that defect could be cured through a limited grant of discovery." *Id.*; *see also In re Fed. Republic of Nigeria*, No. 21-MC-0007 (JGK) (VF), 2022 WL 4234556, at *6 (S.D.N.Y. Sept. 14, 2022).

II.    **Analysis**

A.    <u>The Statutory Requirements Are Met</u>

Petitioner argues that it has met the Section 1782 statutory requirements. (*See* ECF 13 Ex. 1, Petitioner's Mem. at 14-16.) Respondents contend that the "Petition suffers from multiple infirmities, but the requirement that any discovery sought pursuant to Section 1782 must be 'for use' in a foreign proceeding is an essential element SBK cannot satisfy." (ECF 22, Respondents' Opp. at 10.)  For the reasons set forth below, I agree with Petitioner that the statutory requirements are met.

11

**SPA-11**

1.   Akin Is Found in this District

Respondents do not appear to contest that Akin is found in this District. And in filings with the New York Secretary of State, both Akin Gump Strauss Hauer & Feld LLP and Akin Gump LLP are registered limited liability partnerships in the State of New York, and Akin Gump LLP has its principal business office listed as being in Manhattan (*See* ECF 3, Piazza Decl. Ex. I, New York Department of State Entity Information.) Thus, Akin resides in the Southern District of New York for purposes of Section 1782 and the first statutory requirement is satisfied. *See Daimler AG v. Bauman,* 571 U.S. 117, 137 (2014) ("[T]he place of incorporation and principal place of business are paradigmatic . . . bases for general jurisdiction."); *In re Del Valle Ruiz*, 342 F. Supp. 3d 448, 459 (S.D.N.Y. 2018) (holding that a corporation that maintained its principal place of business within the district satisfied the statutory "resides or is found" within district requirement for discovery order), *aff'd*, 939 F.3d 520 (2d Cir. 2019).

2.   The Discovery Sought Is for Use in a Foreign Proceeding

Petitioner states that it seeks the contemplated discovery for use in (1) the Malta Action against Open Pass and Fortenova Group for damages caused by the approval of the Corporate Changes, (2) in the Anticipated Litigation to seek damages caused by the MidCo Sale, and (3) in the EU Action challenging Petitioner's status as a sanctioned entity. (*See* ECF 13 Ex. 1, Petitioner's Mem. at 2-3, 18.) Petitioner argues that the Foreign Proceedings are the types of proceedings contemplated by Section 1782 and that the discovery sought is relevant to those actions. (*See id.* at 17-19.)

Respondents counter that the Malta Action is likely to be dismissed in the near future, just as a similar claim by Petitioner in Malta was dismissed in April 2024, and that the

12

**SPA-12**

Anticipated Litigation is not "reasonably contemplated" as required under the caselaw interpreting Section 1782. (*See* ECF 22, Respondents' Opp. at 10-14.) Respondents also argue that the discovery sought does not satisfy the requirement of being "for use" in a foreign proceeding, because Petitioner has not demonstrated that such discovery would increase the likelihood of success in the Malta Action or the EU Action. (*See id*. at 12-13.)

a.   *There Are Qualifying Foreign Proceedings*

In analyzing whether discovery being sought under Section 1782 is "for use in a proceeding before a foreign tribunal," courts look to whether "there actually is a foreign proceeding," *Jiangsu Steamship Co., Ltd. v. Success Superior Ltd*., No. 14-CV-9997(CM), 2015 WL 3439220, at *4 (S.D.N.Y Feb 5, 2015) (citing *Intel*, 542 U.S. 241 at 259), as well as "whether [the] foreign proceeding is adjudicative in nature." *Euromepa, S.A. v. R. Esmerian, Inc*., 154 F.3d 24, 27 (2d Cir. 1998). There actually is a foreign proceeding if a foreign proceeding is pending or "reasonably contemplated." *Jiangsu Steamship Co.,* 2015 WL 3439220, at *4 (citing *Intel*, 542 U.S. 241 at 259). Here, two of the Foreign Proceedings – the Malta Action and the EU Action – are currently pending (*see* ECF 5, Refalo Decl. ¶ 1; ECF 13 Ex. 3, Lansky Decl. ¶¶ 8-10, 16-17; ECF 33, Petitioner's Reply Ex. 1, Second Lansky Decl. ¶¶ 11-14), which satisfies the first requirement. While Respondents may be correct that the Malta Action is likely to be dismissed in the near future, until that happens, the Malta Action is an appropriate predicate for a grant of discovery under Section 1782. *See In re Children's Investment Fund Foundation (UK)*, 363 F. Supp. 3d 361, 377 (S.D.N.Y. 2019) (declining to "engage in speculation about how any of the

**SPA-13**

Foreign Proceedings may be resolved" and stay the 1782 petition based on the respondent's claim that the foreign proceedings were "likely to be dismissed").[6]

Respondents do not appear to contest that the Malta Action and the EU Action are adjudicative in nature. (*See* ECF 22, Respondent's Opp. at 10.) I believe that the Malta Action is adjudicative in nature, in that it asks the court in Malta to (1) declare that the defendants in that case abused their rights as STAK DR Holders and caused damage to Petitioner and (2) order the defendants to pay damages to Petitioner. (*See* ECF 5, Refalo Decl. Ex. 1 at 34.) And I believe that the EU Action is also adjudicative, because it asks for a determination that Petitioner should not be a sanctioned entity. (*See* ECF 33, Petitioner's Reply Ex. 1, Second Lansky Decl. ¶ 7.) Accordingly, the Malta Action and the EU Action qualify as foreign proceedings for purposes of Section 1782.

It is not clear that the Anticipated Litigation would be sufficient standing alone to satisfy the requirement that there is an "identifiable foreign proceeding" that is "reasonably contemplated." *Jiangsu Steamship Co.*, 2015 WL 3439220, at *4 (citing *Intel*, 542 U.S. at 259) (noting that a foreign proceeding need not be pending or imminent but must be "within reasonable contemplation"). However, Petitioner is seeking the same discovery for use in the Anticipated Litigation as it seeks in the Malta Action and the EU Action (*see* ECF 5, Refalo Decl. ¶ 5; ECF 13 Ex. 3, Lansky Decl. ¶¶ 13-15), and since the pendency of the Malta Action and the

---

[6]     Respondents suggest that the Court should "hold" its decision until some unspecified time in the future when the Maltese court decides whether to dismiss the Malta Action as vexatious (*see* ECF 22, Respondents' Opp. at 14), but they provide no case law supporting that outcome, and I have been unable to locate any. I therefore see no basis for recommending that Your Honor delay a decision on the Petition.

EU Action satisfies the requirement of a foreign proceeding, I need not address whether the
Anticipated Litigation would also satisfy the requirement.

> b. *Discovery "for Use" in a Foreign Proceeding*

The statutory "for use" factor requires a showing that the requested discovery is
"relevant to the subject matter of the [foreign] proceeding, and the evidence would 'increase
the applicant's chances of success' in the proceeding." *In re Asia Mar. Pac., Ltd*., 253 F. Supp. 3d
701, 706 (S.D.N.Y. Aug. 26, 2015) (quoting *Mees*, 793 F.3d at 299). Rule 26(b) of the Federal
Rules of Civil Procedure requires that information sought through discovery be relevant to a
claim or defense. Thus, an applicant's discovery requests should be "tailored to seek
information relevant to the parties' claims and defenses and proportional to the needs of the
case." *Athene Holding Ltd. v. Dang*, No. 23-MC-0171 (JHR) (SLC), 2023 WL 5348950, at *3
(S.D.N.Y. Aug. 21, 2023) (internal quotation marks and citation omitted). Additionally, however,
as explained by the Second Circuit, because Congress "adopt[ed] the phrase 'for use,'" it
"plainly meant to require that § 1782 applicants show that the evidence sought is something
that will be employed with some advantage or serve some use in the proceeding." *Certain
Funds, Accounts and/or Investment Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 120 (2d Cir. 2015). As
a result, courts addressing requests for discovery under Section 1782 must determine whether
the applicant "will actually be able to *use* the information in the proceeding." *Id.* (internal
quotation marks and citation omitted).

> i.   The Parties' Arguments

Respondents argue that the discovery sought by Petitioner does not meet the statutory
for use requirement because "much of the discovery SBK seeks is either privileged or already

**SPA-15**

possessed by" Fortenova Group or the EU Council, which are SBK's "true adversaries." (ECF 22, Respondents' Opp. at 12-13.) Respondents conclude that Section 1782 is an inappropriate mechanism for obtaining such discovery, because Section 1782 does not contemplate seeking discovery of materials that already are possessed by the adversaries of the party seeking discovery; Respondents also state that Section 1782 does not permit discovery of privileged materials. (*See id*.) Respondents posit that the only remaining categories of requested discovery would be non-privileged materials either "uniquely possessed by Akin" or shared only "with third parties other than" Fortenova Group and the EU Council; Respondents assert that Petitioner has failed to offer an explanation of the relevance of any such materials, which Respondents say are by definition irrelevant to the Malta Action, because Fortenova Group "could not have been influenced in any way by documents that" it never saw, and to the EU Action, because the EU Council likewise could not have been influenced by documents it did not see. (*Id.*) Respondents also contest Petitioner's contention that Akin did significant work for Fortenova Group as a lobbyist: according to Respondents, "Akin was retained by Fortenova as its legal counsel, and nearly all the work Akin has done for Fortenova has been in that capacity." (ECF 38, Respondents' Response at 7; ECF 41, Second Pees Decl. ¶¶ 10-13.)

Petitioner makes clear that it seeks documents beyond those "uniquely possessed by Akin" and/or documents that were "shared with third parties other than" Fortenova Group and the EU Council: Petitioner also seeks "communications directly or indirectly with Fortenova regarding Akin's investigative work." (ECF 37, Petitioner's Response at 7.) Petitioner argues that such documents, if not privileged, are subject to discovery through the Application even if they may also be within Fortenova Group's possession. (*See id.*) And Petitioner explains that

16

**SPA-16**

documents shared with the EU Council are "not as a practical matter accessible to SBK in the EU Action as the procedural rules governing annulment proceedings before the E.U. General Court do not allow for broad-based discovery from the E.U. Council." (*Id.* at 8 (citing Third Lansky Decl. ¶¶ 7-9).)

Petitioner agrees, as it must, that privileged documents may not be obtained pursuant to Section 1782. *See* 28 U.S.C. § 1782(a) ("A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege."); *In re Okean B.V. & Logistic Sol. Int'l*, 60 F. Supp. 3d 419, 428 (S.D.N.Y. 2014) (holding that production of the requested materials "would not only be burdensome" but "would offend core tenets of our legal system (and those of Russia and Ukraine), which each respect a client's privileged communications with counsel" and explaining that under Section 1782, "[a] person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege"). Petitioner states that it does not seek privileged materials but rather documents that are not privileged because they relate to lobbying efforts or were shared with or received from third parties. (*See* ECF 33, Petitioner's Reply at 5.)

As to the documents sought that Petitioner contends are not privileged, Petitioner seems to interpret Respondents' argument that such materials are irrelevant to the Malta Action and the EU Action as going to the issue whether the requested discovery would be admissible in those actions. Petitioner responds that "the discoverability and admissibility" of requested discovery "in the foreign jurisdiction plays no role in a court's analysis of a Section 1782 petition." (*Id.* at 4.)

17

**SPA-17**

ii.    Analysis

Petitioner is correct that, "as a district court should not consider the discoverability of

the evidence in the foreign proceeding, it should not consider the admissibility of evidence in

the foreign proceeding in ruling on a section 1782 application." *Brandi-Dohrn v. IKB Deutsche*

*Industriebank AG*, 673 F.3d 76, 82 (2d Cir. 2012). However, Respondents do not appear to be

arguing that the evidence sought by the Application would be inadmissible. They appear to be

making a different point when they argue that the discovery sought is not "for use" in the Malta

Action and the EU Action. Respondents cite to a case from the District of New Hampshire to

support their position that a court should not grant a Section 1782 petition when the discovery

sought is not relevant to the foreign proceedings. (*See* ECF 22, Respondents' Opp. at 13 n.6

(citing *In re Pilatus Bank PLC*, No. 20-MC-94 (JD), 2021 WL 1890752, at *9 (D.N.H. May 11,

2021).)

This general proposition is non-controversial: even though courts should not delve into

whether Section 1782 materials would be admissible in a foreign proceeding, Rule 26(b) of the

Federal Rules of Civil Procedure, which requires that information sought through discovery be

relevant to a claim or defense, necessitates some inquiry into whether the discovery sought is

relevant to the issues in the foreign proceeding. *See Certain Funds, Accounts &/or Inv. Vehicles*,

798 F.3d at 120 n.7 (noting the possible need for a threshold relevance determination "insofar

as it is difficult to conceive how information that is plainly irrelevant to the foreign proceeding

could be said to be 'for use' in that proceeding"); *In re Refineria de Cartagena S.A.S.*, No. 23-

MC-0455 (JPC), 2024 WL 95056, at *7 (S.D.N.Y Jan. 8, 2024) (explaining that in a Section 1782

application the "burden imposed on the applicant" to establish the relevance of the material

18

**SPA-18**

sought "is de minimis").

However, I do not believe that the relevance inquiry demanded by Respondents leads to their preferred outcome of a determination that the discovery sought is not relevant to and therefore not "for use" in the Malta Action or the EU Action. Petitioner has articulated why the requested discovery is relevant to the Malta Action: the materials may provide evidence of a "scheme that culminated in the sham transaction" that stripped Petitioner of its ownership interests in Fortenova Group. (ECF 13 Ex. 1, Petitioner's Mem. at 18; ECF 5, Refalo Decl. ¶ 5 (stating that the discovery sought is relevant to, among other issues in the Malta Action, why STAK viewed Petitioner as continuing to be controlled by Sberbank after Petitioner was acquired by Mr. Alketbi).) Petitioner has likewise provided an explanation of the relevance of the discovery it seeks for the EU Action: the materials may show that Akin engaged in lobbying on behalf of Fortenova Group to convince the EU Council unfairly to declare Petitioner a sanctioned entity. (*See* ECF 33, Petitioner's Reply Ex. 1, Second Lansky Decl. ¶ 20 (stating that "the circumstances surrounding the issuance of the Akin Opinion and its further use in the context of SBK ART's designation in the EU are of extreme relevance for the EU Action").)

Respondents' counterargument – that Fortenova Group and the EU Council "could not have been influenced in any way by documents that" they never saw (ECF 22, Respondents' Opp. at 13)[7] – does not persuade me that the requested documents are irrelevant to the Foreign Proceedings. Respondents' argument that documents that Fortenova Group never saw

---

[7]    As Petitioner has clarified, it is also seeking non-privileged communications between Fortenova Group and Akin; the argument that Fortenova Group could not have been influenced by documents it did not see would clearly not apply to such documents.

are necessarily irrelevant to the Malta Action (or that the EU Council never saw are necessarily irrelevant to the EU Action) proves too much. *Intel*'s requirement that the entity from which discovery pursuant to Section 1782 is sought not be a participant in the predicate foreign proceedings means that many applications pursuant to the statute seek discovery that has not been seen by the adverse party in such proceedings. Respondents cite no case suggesting that such discovery is necessarily irrelevant to the foreign proceedings, and my own research has turned up no case supporting Respondents' position.

Here, Petitioner seeks documents from Akin's files to test its theory that the Akin Opinion was not well-founded, leading the EU Council to incorrectly conclude that Petitioner should be sanctioned, which would be relevant in both the EU Action and the Malta Action, even if the EU Council and Fortenova never saw any such documents. It is somewhat harder, but not impossible, to envision non-privileged documents never seen by Fortenova Group that could provide evidence of a scheme that culminated in the Corporate Changes. Under the circumstances, I conclude that Petitioner has demonstrated that certain of the discovery it seeks meets the test of being relevant and therefore "for use" in the EU Action and the Malta Action.

Separately, it is not clear to me that one of Respondents' predicates – that documents produced to the EU Council, a government body and not an Akin client, would be exempt from production on the theory that such documents could be obtained by Petitioner from the EU Council in the EU Proceeding – is sound. While the parties submitted expert opinions taking somewhat different positions on whether, as a practical matter, taking discovery of the EU Council would be possible, the parties seem to agree that there would be significant barriers to

20

**SPA-20**

obtaining any such discovery. (*See* ECF 37, Petitioner's Response at 8; ECF 38, Respondents' Response at 16-19.) And there is no requirement that a Section 1782 petitioner seek discovery in the foreign proceeding before bringing a 1782 petition. *See In re Catalyst Managerial Servs.*, 680 F. App'x at 41. "Courts may grant § 1782 applications even where the applicant did not first seek discovery in the foreign tribunal . . . , or where the information sought was not discoverable under the laws of the foreign country at issue in the foreign proceeding." *In re BNP Paribas Jersey Tr. Corp. Ltd.*, No. 18-MC-0047 (PAC), 2018 WL 895675, at *3 (S.D.N.Y. Feb. 14, 2018) (internal quotation marks and citation omitted).

Respondents state that although they cannot be sure without doing a complete document collection, it is their "current understanding that no Akin timekeepers have communicated with the EU Council in relation to Akin's work for Fortenova." (*See* ECF 38, Respondents' Response at 11; ECF 41, Second Pees Decl. ¶¶ 14-16.) However, Respondents have made no definitive representation that they never communicated with the EU Council in relation to Akin's work for Fortenova. Even if it turns out that there are no such documents, that is not a reason excuse Respondents from performing a reasonable search to confirm their current understanding.

For all these reasons, I conclude that Petitioner has satisfied the "for use" requirement.

3.  The Application Is Brought by an Interested Party

The Application is brought by Petitioner, which currently is an interested party in the pending Foreign Proceedings; it is a plaintiff in the Malta Action and an applicant in the EU Action. (*See* ECF 5, Refalo Decl. ¶ 3; ECF 13 Ex. 3, Lansky Decl. ¶ 8.) Respondents do not contest that Petitioner meets this requirement.

21

**SPA-21**

\*\*\*

Having been persuaded that the Application meets the statutory requirements of Section 1782, I turn to the discretionary factors set forth in *Intel*.

B.     The Discretionary Factors Favor Granting the Application

Petitioner argues that each of the four *Intel* Factors weighs in favor of granting the discovery requested by the proposed subpoena: (1) Akin is not a party to the Foreign Proceedings; (2) there is no indication that courts overseeing the Foreign Proceeding would reject the requested discovery; (3) the Application does not reflect an effort to circumvent foreign restrictions on discovery; and (4) the Application is "narrowly tailored to include only relevant and readily identifiable information and documents and avoid any undue burden on Akin." (ECF 13, Petitioner's Mem. at 21-24.)

Respondents take the position that three of the *Intel* Factors cut against granting the Application: whether "the person from whom discovery is sought is a participant in the foreign proceeding"; "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and whether the request is "unduly intrusive or burdensome." (ECF 22, Respondents' Opp. at 14.) Indeed, Respondents assert that those three factors are "particularly favorable to Akin in light of the Second Circuit's decision in *Kiobel v. Cravath Swaine and Moore LLP*, which strongly cautions against allowing petitioners to use Section 1782 to obtain discovery from law firms in the US in connection with their representation of foreign clients – precisely what SBK seeks to do here." (*Id.* at 9-10 (citing *Kiobel*, 895 F.3d 238, 246 (2d Cir. 2018)).)

22

**SPA-22**

For the reasons set forth below, I agree with Petitioner that the discretionary *Intel* Factors, on balance, favor granting the Application.

> 1. The First *Intel* Factor: Whether the Entity from Which Discovery Is Sought Is a Participant in the Foreign Proceeding

The first *Intel* Factor examines whether "the person [or entity] from whom discovery is sought is a participant in the foreign proceeding, in which case the need for Section 1782(a) aid generally is not as apparent." *Mangouras*, 980 F.3d at 97 (internal quotation marks and citation omitted).

> *a. The Parties' Arguments*

Petitioner asserts that Akin is not a party to the Malta Action or the EU Action. (*See* ECF 5, Refalo Decl. ¶¶ 1, 3 & Ex. 1 (Complaint in Malta Action); ECF 13 Ex. 3 Lansky Decl. ¶¶ 8-10.)

Respondents counter that while it is technically the case that Akin is not a party to the Malta Action or the EU Action, the first *Intel* Factor weighs against discovery when "'for all intents and purposes petitioners are seeking discovery from . . . their opponent in the [foreign] litigation.'" (ECF 22, Respondents' Opp. at 15 (quoting *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 85 (2d Cir. 2004)).) Respondents take the position that the Application "seeks documents that are possessed by Akin exclusively by virtue of its representation of Fortenova," which has possession, custody, and control "of the entire universe of responsive documents," including non-privileged documents that were not originally shared with Fortenova Group. (ECF 22, Respondents' Opp. at 15.) Respondents argue that granting the requested discovery would be particularly problematic here, since Petitioner "seeks discovery from Akin's US office when all Akin's work was performed by or at the direction of its London-based lawyers." (*Id.* at 17.)

23

**SPA-23**

Respondents point out that granting a Section 1782 petition if the documents are undiscoverable from the client abroad disturbs the attorney-client relationship. (*See id.* at 18 (citing *Kiobel*, 895 F.3d at 246).)

Petitioner responds that it does not seek Fortenova Group "corporate documents that have been entrusted to a lawyer in connection with legal representation," but instead "the records of an independent due diligence and analysis generated by the firm"; and that Fortenova's control over Akin's documents "exists only insofar as they may be privileged." (ECF 33, Petitioner's Reply at 9-10.)[8] However, Petitioner later clarified that in making that statement, Petitioner meant only that "Fortenova could have a veto power over production only to the extent that the documents might be privileged" and that Petitioner "did not purport to make a general pronouncement as to whether under Dutch or Maltese law Fortenova is deemed as a legal matter to have constructive possession over documents not physically in its possession but held extraterritorially in the hands of a law firm." (ECF 37, Petitioner's Response

---

[8]    Petitioner also argues that the case primarily relied on by Respondents, *Kiobel*, is distinguishable because the law firm target of discovery possessed the materials in question because its client had produced them in an earlier litigation subject to a confidentiality agreement limiting their use to that litigation. (*See id.*) As Petitioner correctly notes, the Second Circuit held that ordering the firm to re-produce the documents for a different proceeding without participation from the client would have modified the confidentiality order in the prior action – an "extraordinary, and possibly unique" feature of the case that, according to Petitioner, "led the Circuit to bar Section 1782 discovery." (*Id.* (quoting *Kiobel,* 895 F.3d at 246-47).) Petitioner overstates the significance of the confidentiality order to the Second Circuit's decision, which rested on "the *Intel* Factors, the respect owed to confidentiality orders, and the concerns for lawyer-client relations," without any of those factors being elevated over the others. *Kiobel*, 895 F.3d at 248. In so doing, Petitioner neglects to fully address the other considerations animating the decision in *Kiobel,* particularly the first *Intel* Factor. That the documents at issue in the Application are not subject to a confidentiality agreement is not dispositive.

24

**SPA-24**

at 6-7.) At oral argument, Petitioner suggested that the requested discovery could be granted solely in connection with the EU Action, which would moot Respondents' argument that Petitioner is effectively seeking discovery of a party (because unlike Fortenova Group, the EU Council is not Akin's client). However, when I pointed out that the scope of appropriate discovery could be quite different under that new theory (for example, it is unlikely that discovery on the Corporate Changes would be particularly relevant in the EU Action), Petitioner did not press the issue.

### b. Analysis

Respondents are correct that courts are generally reluctant to find that the first *Intel* Factor supports requiring a law firm to provide discovery pursuant to Section 1782 when the firm's client or former client is the adverse party in the relevant foreign proceeding. *See, e.g., Kiobel,* 895 F.3d at 245 (citing *Schmitz,* 376 F.3d at 85); *In re Hulley Enters., Ltd.*, 358 F. Supp. 3d 331, 346-47 (S.D.N.Y. Feb. 19, 2019), *report and recommendation adopted,* 400 F. Supp. 3d 62 (S.D.N.Y. Sept. 5, 2019).

Allowing discovery from a U.S. respondent that is the agent of the petitioner's foreign adversary when the documents sought are within the possession or control of the petitioner's foreign adversary could "invite foreign parties to end-run directly seeking discovery from their adversaries in the foreign proceeding by serving § 1782 subpoenas on the adversaries' U.S.-based agents." *In re Klein*, No. 23-MC-0211 (PAE), 2023 WL 8827847, at *11 (S.D.N.Y. Dec. 21, 2023). However, there have been circumstances where courts in this District have found that the first *Intel* Factor supported requiring production by a U.S. law firm even though its client or former client was the adverse party in the underlying foreign proceeding or that ordering the

25

law firm to provide the requested discovery was appropriate notwithstanding the first *Intel* Factor. *See, e.g., In re Degens*, No. 20-MC-0237 (JGK) (RWL), 2020 WL 4252725, at *4-6 (S.D.N.Y. July 24, 2020) (granting a petitioner's request for discovery in connection with a foreign divorce proceeding from a law firm that represented the petitioner's ex-husband and his businesses because "granting the request would help the [foreign] court," the "requests were not unduly intrusive or burdensome," and any privilege issues could be addressed in "privilege logs"); *In re Lane*, No. 22-MC-0034 (LGS), 2022 WL 16737132, at *3-5 (S.D.N.Y. Nov. 7, 2022) (granting a petition seeking discovery from law firm that represented a party to the foreign litigation where the final three *Intel* Factors supported production); *Pearson v. Trinklein*, No. 21-MC-0770 (ALC) (JLC), 2022 WL 1315611, at *4-5 (S.D.N.Y. May 3, 2022) (granting a petition seeking discovery from a law firm that had represented a decedent and some of his heirs for use in a foreign dispute over the estate, even though some of the heirs were parties, when the law firm did not argue that the first *Intel* Factor cut against ordering the requested discovery); *In re Alghanim*, No. 17-MC-0406 (PKC), 2018 WL 2356660, at *4 (S.D.N.Y. May 9, 2018) (granting a petitioner's discovery request of a law firm that represented a party in the foreign proceeding because that party could not be located); *cf. In re Okean*, 60 F. Supp. 3d at 422 (noting that the Court had previously held that Okean had satisfied the first three discretionary *Intel* Factors even though the petition sought discovery of a law firm that had previously represented several parties to the underlying foreign proceeding and that the Court had therefore required the law firm to search for and produce a sampling of documents before concluding that ordering a full production would be unduly burdensome).

26

**SPA-26**

I believe that a significant question in analyzing the first *Intel* Factor in this matter is whether the discovery requests directed at Akin "are in substance a backdoor means of obtaining the documents of the adverse party in the foreign proceeding" – or, put another way, what entity is the "'real party from whom documents are sought.'" *In re BM Brazil 1 Fundo de Investimento em Participações Multistratégia*, No. 23-MC-0208 (JGLC) (GS), 2024 WL 555780, at *10 (S.D.N.Y. Jan. 18, 2024) (quoting *Kiobel*, 895 F.3d at 245).

"[D]ocuments in the possession of a party's attorney are deemed to be within the party's possession, custody, or control." *In re Alghanim*, No. 21-MC-0167 (LTS), 2022 WL 1423088, at *3. Law firm clients generally have the ability to obtain documents from their lawyers on demand. *See, e.g., In re Mare Shipping Inc.*, No. 13-MC-0228 (PKC), 2013 WL 5761104, at *4 (S.D.N.Y. Oct. 23, 2013) (citing cases), *aff'd sub nom*. *Mare Shipping Inc. v. Squire Sanders (US) LLP*, 574 Fed. App'x 6 (2d Cir. 2014). In one case seeking Section 1782 discovery from the U.S. lawyer for a party to the foreign litigation for which the discovery was sought, the Second Circuit explained that, "[a]lthough technically the respondent in the district court was [the law firm], for all intents and purposes petitioners are seeking discovery from [the client], their opponent in the [foreign] litigation." *Schmitz*, 376 F.3d at 85. The Second Circuit went on to say that "*Intel* suggests that because [the client] is a participant in the [foreign] litigation subject to [foreign] court jurisdiction, petitioner's need for § 1782 help 'is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad.'" *Id.* (quoting *Intel*, 542 U.S. at 264). Similarly, in *Kiobel*, the Second Circuit reversed the district court's grant of a Section 1782 petition for discovery from a U.S. law firm where the petition

27

**SPA-27**

effectively sought discovery from the firm's client, which was "subject to jurisdiction in the foreign tribunal." *Kiobel*, 895 F.3d at 245.

Petitioner argues that, unlike the petitioners in *Schmitz* and *Kiobel,* it is not seeking Fortenova Group documents that happen to be in Akin's possession because of Akin's representation of its client, but instead is seeking Akin's own documents, created and obtained in connection with the Akin Opinion and Akin's lobbying efforts on behalf of Fortenova Group. (*See* ECF 33, Petitioner's Reply at 13.) And there is some support in the case law for distinguishing between the subpoenaed party's "own business records" and records of the party before the foreign court proceeding. *In re BM Brazil*, 2024 WL 555780, at *10. But the focus of this distinction is whether and if so to what extent the subpoenaed entity's records are discoverable in the foreign tribunal. *See id.* (granting discovery from "a legitimate third-party witness outside the jurisdictional reach of the [foreign court] who has potentially relevant evidence of its own, to which [the party to the foreign litigation] has no access" and finding that, "even if the Subpoenas embrace a smattering of communications" in possession of the party to the foreign litigation, "that is no reason to condemn [the petitioner's] entire request as improper"); *see also In re Batbold*, No. 21-MC-0218 (RA) (OTW), 2023 WL 2088524, at *5 (S.D.N.Y. Feb. 17, 2023) (ruling that the first *Intel* Factor supported the petitioner because "at least some of the discovery" that had been requested was "not obtainable in the foreign proceeding[ ]"); *In re OOO Promnefstroy*, No. 19-MC-0099 (RJS), 2009 WL 3335608, at *4-7 (S.D.N.Y. Oct 15, 2009) (ruling that, since the "vast majority" of the requested discovery was "also in the possession of parties to the foreign proceeding" and therefore within the jurisdictional reach of the foreign tribunal, the first *Intel* Factor cut against the petitioner).

28

**SPA-28**

Indeed, the Second Circuit has held that courts considering Section 1782 petitions may, in assessing the first *Intel* Factor, consider whether a foreign court could order the parties before it to produce documents. *See, e.g., Frasers Grp. PLC v. Stanley*, 95 F.4th 54, 58 (2d Cir. 2024) (finding that consideration of whether documents were available in the foreign proceedings was appropriate and did not impermissibly impose an exhaustion requirement); *Effecten-Spiegel AG v. Lynch*, 771 F. App'x 38, 39 (2d Cir. 2019) ("With respect to the first and second *Intel* Factors, the District Court was entitled to consider the possibility that much of the requested discovery could be obtained from . . . a party to the [foreign] litigation.").

Thus, I assessed whether Fortenova Group could demand that Akin give them the documents sought by the proposed subpoenas, or any of them. When I asked Petitioner to provide information on this issue (ECF 35, Order), Petitioner resisted the question by arguing that "[t]he Second Circuit . . . has cast serious doubt on an interpretation of the first *Intel* Factor that would bring within its scope considerations of jurisdictional control over *documents* in addition to control over *parties.*" (ECF 37, Petitioner's Response at 3 (citing cases).) Petitioner does state that Fortenova Group could have veto power over Akin's production only to the extent the documents are privileged (*see* ECF 37, Petitioner's Response at 6-7), but that is a slightly different matter.

The caselaw in this jurisdiction supports the proposition that a client generally may obtain documents from its lawyer on demand. *See, e.g., Kiobel,* 895 F.3d at 245 (citing *Schmitz,* 376 F.3d at 85); *In re Hulley Enters.*, 358 F. Supp. at 346-47. Because it seems likely that many of the documents sought by the proposed subpoenas could be demanded by Fortenova Group from Respondent, the first *Intel* Factor would cut against granting the Application. However,

29

**SPA-29**

Petitioner is correct that that this conclusion "does not automatically foreclose § 1782 aid." (ECF 37, Petitioner's Response at 7 (quoting *Gorsoan Ltd. v. Bullock,* 652 Fed. App'x 7, 9 (2d Cir. 2016)).)

> 2. The Second *Intel* Factor:
> Receptivity of the Foreign Forum to Judicial Assistance

The second *Intel* Factor concerns "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Mangouras*, 980 F.3d at 97-98 (internal quotation marks and citation omitted). "Absent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district courts to provide some form of discovery assistance[,]" and a court "should deny discovery on the basis of lack of receptiveness only where it is provided with 'authoritative proof that [the] foreign tribunal would reject evidence obtained with the aid of section 1782.'" *In re Atvos Agroindustrial Investimentos S.A.*, 481 F. Supp. 3d 166, 176-77 (S.D.N.Y. 2020) (quoting *Euromepa*, 51 F.3d at 1100-02); *see also In re Safra*, No 21-MC-0640 (GHW) (JLC), 2022 WL 3584541, at *5 (S.D.N.Y. Aug. 22, 2022) (noting that "objection to U.S. federal-court judicial assistance would have to come from an official source, such as an agent of the [foreign] government"); *Schmitz,* 376 F.3d at 84 (denying the discovery request where the German Ministry of Justice and local German prosecutor asked the district court to do so).

Petitioner argues that this factor cuts in its favor because Maltese counsel states that the use of Section 1782 to obtain discovery is not prohibited or discouraged in Malta. (*See* ECF

5, Refalo Decl. ¶¶ 6-7.) Even Respondents concede that this factor is neutral in this matter. (*See*

ECF 22, Respondents' Opp. at 14.) I conclude that this factor supports granting the Application.

> 3. The Third *Intel* Factor: Circumvention of Foreign Proof-Gathering Restrictions

The third *Intel* Factor asks "whether the . . . request conceals an attempt to circumvent

foreign proof-gathering restrictions or other policies of a foreign country or the United

States," *Mangouras*, 980 F.3d at 98, which occurs if the application is an attempt to evade

discovery procedures in the foreign jurisdiction, or if the application is otherwise a "bad faith

endeavor to misuse Section 1782." *In re Bouka*, 637 F. Supp. 3d 74, 90 (S.D.N.Y. 2022); *see also*

*In re Hansainvestment Hanseatische Inv.-GmbH,* 364 F. Supp. 3d 243, 251 (S.D.N.Y.

2018) (holding that the third *Intel* Factor weighed in the applicant's favor because "the Court is

not persuaded that Applicants have engaged in any improper or bad faith evasion of German

procedures").

> a. The Parties' Arguments

Petitioner claims there is no indication that it is trying to avoid foreign restrictions on

gathering evidence. (*See* ECF 13, Petitioner's Mem. at 22-23.) Maltese counsel explains that "as

long as discovery is lawfully obtained in the relevant jurisdiction, Maltese courts are amenable

to receiving the results of that discovery in evidence in Maltese proceedings." (ECF 5, Refalo

Decl. ¶ 6.) Foreign counsel similarly states that the EU tribunal is open to discovery lawfully

obtained in a foreign jurisdiction. (*See* ECF 13 Ex. 3, Lansky Decl. ¶ 16.)

Respondents argue that Petitioner has already sought and been denied the requested

discovery in foreign fora and that Petitioner would be unable to obtain any of the materials it

requests in the foreign proceedings due to proof-gathering restrictions – prohibitions (1)

31

against discovery being taken by a sanctioned entity, particularly for use in a proceeding, such as the Malta Action, to seek financial benefits, (2) preventing a party from obtaining discovery from the adverse party's legal counsel, and (3) preventing disclosure due to foreign privilege and confidentiality concerns. (*See* ECF 22, Respondents' Opp. at 18-19.) Respondents contend that Petitioner is not an entity seeking discovery that cannot be obtained in foreign fora but instead is seeking discovery it is prohibited from receiving in the foreign fora, which Respondents maintain amounts to an attempt to circumvent foreign proof-gathering restrictions. (*See id.* at 20-21.)

Petitioner denies that the courts in Malta Action and the EU Action rebuffed its efforts to obtain the discovery it now seeks here, saying that it never sought discovery in those fora. (*See* ECF 33, Petitioner's Reply at 11; ECF 5, Refalo Decl. ¶ 1; ECF 33-2, Second Lansky Decl. ¶¶ 11-14.) And it dismisses Respondents' other arguments with the assertion that this Court "is not tasked with exploring the nuances of admissibility in the foreign court venue" or engaging in "'speculative forays into legal territories unfamiliar to federal judges.'" (*See* ECF 33, Petitioner's Reply at 12 (quoting *Euromepa*, 51 F.3d at 1099).) Petitioner insists that, "In the absence of any evidence that [it] is seeking to game the system or circumvent conclusive rulings against it, this factor does not support Akin's defense." (*Id.*)

Respondents counter that there are EU laws that could prohibit discovery of documents provided to the EU Council and that Petitioner's efforts to require Respondents to produce such documents falls afoul of foreign proof-gathering restrictions. (*See* ECF 38, Respondents' Response at 16.) Respondents also rely on the declarations of Ross Denton, Christiaan R. Zijderveld, and Daniel Buttigieg to support their position that they would risk facing foreign law

32

**SPA-32**

exposure if they were required to produce documents to a sanctioned entity. (*See* ECF 22, Respondents' Opp. at 18 (citing ECF 24, Denton Decl. ¶¶ 29-32, ECF 25, Buttigieg Decl. ¶¶ 23-25, and ECF 26, Zijderveld Decl. ¶¶ 39-40)).)

On the question whether Respondents would risk violating foreign law by producing documents to a sanctioned entity, one of Petitioner's foreign law experts dismisses as "completely unfounded" Respondents' argument that they face potential liability for EU and U.K. sanctions violations if they produce documents to Petitioner. (ECF 33, Petitioner's Reply at 14; ECF 33-3, Al-Karim Decl. ¶ 42.)

Respondents counter that "the declarations of its experts correctly describe the operative foreign sanctions rules and how they operate to prohibit SBK from obtaining the discovery sought by its Petition," but say that if the Court believes the issue to be unclear, that lack of clarity cuts against granting the application. (*Id.* at 13-14 (citing *In re Hulley Enters.,* 358 F. Supp. 3d at 352-53 for the proposition that the "lack of clarity [on an issue of foreign law] favors denying the section 1782 application" because granting the application might "require an American law firm with an office in a foreign country to potentially be directed to act in contravention of that foreign country's law").)

Petitioner responds:

Akin submits a throw-away line cautioning the Court that it is unclear whether sanctions prevent any party in Europe from providing a sanctioned entity with information in connection with a dispute. However, the foreign law experts for both parties before this Court agree that SBK ART retains the fundamental ability to participate in the legal process, including, but not limited to, the collection of evidence. Indeed, the EU Council itself provided disclosure to SBK ART when it turned over a copy of the Akin Opinion. As set forth in the first Lansky declaration and the Al Karim declaration, sanctioned entities have all the same rights as any litigant in any litigation, except that a court may not make funds or

33

**SPA-33**

economic resources available to the sanctioned entity, including at the conclusion of the case, once the parties' respective rights have been fully determined. In line with this, in none of the multiple Dutch summary proceedings between Petitioner and Fortenova has a court ever ruled that Petitioner is not entitled to information due to it being a sanctioned entity.

(ECF 42, Petitioner's Supp. Response at 2.)

> b. Analysis

As noted above, "Courts may grant § 1782 applications even where the applicant did not first seek discovery in the foreign tribunal . . . , or where the information sought was not discoverable under the laws of the foreign country at issue in the foreign proceeding." *In re BNP Paribas*, 2018 WL 895675, at *3 (S.D.N.Y. Feb. 14, 2018) (internal quotation marks and citation omitted). Section 1782 does not have a "foreign-discoverability rule" that would "categorically bar a district court from ordering production of documents where the foreign tribunal or 'interested person' would not be able to obtain the documents if they were located in the foreign jurisdiction." *Fund for Protection of Investor Rights in Foreign States*, 5 F.4th 216, 231 (2d Cir. 2021) (footnote omitted), *reversed on other grounds sub nom. ZF Auto. US, Inc. v. Luxshare, Ltd.*, 596 U.S. 619 (2022).

Indeed, the Second Circuit has held that, "[a]bsent authoritative proof that a foreign tribunal would reject the evidence, we have explained that a court should generally allow discovery if doing so would further § 1782's goals" of "provid[ing] efficient means of assistance to participants in international litigation in our federal courts" and "encourag[ing] foreign countries by example to provide similar means of assistance to our courts." *Fund for Protection of Investor Rights in Foreign States*, 5 F.4th at 230. "[T]o demonstrate circumvention, [a respondent] must illustrate . . . that [the applicant is] engaged in a bad faith endeavor to misuse

34

Section 1782.'" *Refineria de Cartagena,* 2024 WL 95056, at *10 (quoting *In re Hansainvest Hanseatische*, 364 F. Supp. 3d at 251); *see also In re Batbold*, 2021 WL 4596536, at *4 (stating that bad faith is the measure for whether discovery would circumvent foreign proof-gathering restrictions).

Respondents have provided no authoritative proof that the courts in the Malta Action and the EU Action would reject evidence obtained through this proceeding or that Petitioner is acting in bad faith to try to misuse Section 1782.

Respondents make a fair point when they say that Petitioner's "blanket disclaimers" that Petitioner is not seeking privileged information fail to address whether Petitioner would be prohibited from discovering that information in the relevant foreign fora in light of foreign privilege and confidentiality law (*see* ECF 22, Respondents' Opp. at 19). But the question whether producing any of the specific documents called for by the proposed subpoenas would violate relevant foreign privilege or confidentiality law is not one that needs to be resolved now. The Second Circuit has directed courts considering Section 1782 petitions to address concerns about granting the requested discovery by issuing narrow discovery orders rather than denying the relief outright. *See Mees*, 793 F.3d at 302; *Fund for Protection of Investor Rights in Foreign States*, 5 F.4th at 231 (noting that it is preferable for courts to address issues with the scope of discovery "as they arise rather than to impose a categorical bar in the first instance"). If Respondents believe that any of the discovery sought is protected from production by foreign privilege or confidentiality law, that issue can be addressed in connection with a meet-and-confer process after the proposed subpoenas are issued, and, if necessary, through a later request for Court intervention.

35

**SPA-35**

And I am not persuaded that providing discovery to Petitioner puts Respondents at risk of violating foreign sanctions law. Respondents' experts speak in tentative terms about the possibility of sanctions violations because of laws against providing sanctioned entities with "funds and economic resources" (*see* ECF 24, Denton Decl. ¶¶ 29-32; ECF 25, Buttigieg Decl. ¶¶ 23-25; ECF 26, Zijderveld Decl. ¶¶ 39-40), while Petitioner' expert definitively takes the position, which makes more sense, that sanctioned entities are entitled to seek and receive discovery to defend themselves. (*See* ECF 33-3, Al-Karim Decl. ¶ 42 (citing *Mints v. PJSC Bank* [2023] EWCA Civ 1132 (English Court of Appeal decision holding that prohibition on providing "funds and economic resources" does not relate to the exercise of normal judicial functions including discovery)).) Even Respondents do not appear to be saying that there is no way for them to produce the requested materials without a risk of sanctions – they seem to say that sanctions can be avoided if U.S. lawyers do the review and production but claim it is burdensome to ask U.S. lawyers to work on the production when the underlying engagement originated in Europe. (*See* ECF 22, Respondents' Opp. at 24-25.)

Based on the analysis above, I conclude that the third *Intel* Factor weighs in favor of granting Petitioner's Application.

4. The Fourth *Intel* Factor: Whether the
   Discovery Request Is Unduly Intrusive or Burdensome

The fourth *Intel* Factor looks at "whether the request is 'unduly intrusive or burdensome,'" *Mangouras*, 980 F.3d at 98, which is measured by the standards of Rule 26 of the Federal Rules of Civil Procedure. *See In re XPO Logistics, Inc.*, 2017 WL 6343689, at *4 (citing *Mees,* 793 F.3d at 302). In this context, Rule 26 "contemplate[s] that discovery requests

36

**SPA-36**

be tailored to seek information relevant to the parties' claims and defenses and proportional to the needs of the case." *Correios*, 2022 WL 4955312, at \*8. The "proportionality analysis depends on the relevance of the information sought"; in the case of a Section 1782 petition, "relevance is assessed with regard to the foreign proceeding." *In re Catalyst Managerial Servs.,* 680 F. App'x at 39.

### a. The Parties' Arguments

Petitioner argues that the discovery sought would not be unduly burdensome for Akin to produce, as the requests "are tailored to a specific assignment, and a narrowly defined set of communications." (ECF 33, Petitioner's Reply at 14.)

Respondents opine that "SBK seeks to impose oppressive burdens on Akin to obtain documents that will have no relevance in any of the foreign proceedings." (ECF 22, Respondents' Opp. at 21.) Respondents point to four different reasons why the requested discovery sought is unduly burdensome: (1) requiring U.S. attorneys to produce documents obtained through representation of a foreign client chills communications between lawyers and their clients; (2) seeking discovery of materials originating from the foreign office of a U.S. law firm discourages clients from hiring the foreign office of American law firms; (3) "there will be a morass of privilege issues," and "the inevitable disputes over privilege and choice of law questions that will emerge on a document-by document basis guarantee that [responding to the proposed subpoena would] be hugely burdensome for Akin"; and (4) counsel face exposure from producing the requested documents due to Petitioner's status as a sanctioned entity. (*See id.* at 21-24.)

**SPA-37**

Petitioner responds that Respondents overstate the burdens associated with the discovery requests. Petitioner points out that there is no general prohibition on discovery in the U.S. from law firms with foreign offices and that Akin has made decisions about its structure "with full awareness of the implications for its discovery obligations in the United States." (ECF 33, Petitioner's Reply at 13-14.) Petitioner accuses Akin of "protest[ing] too much" about the burdens of addressing choice of law and privilege issues in connection with producing documents in this matter, saying that "[t]his is the normal stuff of litigation and document discovery, and fully within the power of Akin, as a global firm, to accomplish efficiently and cost-effectively." (*Id.* at 14.)

Finally, Petitioner argues that, having met the burden of demonstrating that the discovery sought is relevant, and due to the substantial financial stakes at issue, Petitioner has demonstrated that its need for the requested discovery outweighs any claimed burdens. (*See id.* at 15.)

i.   Privilege Issues

In support of the claim that the privilege issues will be overwhelming, Respondents rely primarily on the declaration of Daniel Buttigieg for the position that documents relating to Akin's representation of Fortenova Group are privileged under Maltese and Dutch law. (*See* ECF 22, Respondents' Opp. at 19 (citing ECF 25, Buttigieg Decl. ¶¶ 7, 12-14 and ECF 26, Zijderveld Decl. ¶¶ 52-53, 60-67).) Respondents assert that "the requests seek categories of documents that are likely to be almost exclusively privileged under foreign law . . ., including Akin's own internal communications and documents, as well as those exchanged between Akin and (a) its

38

**SPA-38**

client, Fortenova; (b) co-counsel to Fortenova as to matters of Dutch law . . . ; and (c) multiple []

agents and advisors." (ECF 38, Respondents' Response at 13.)

Petitioner makes the following points on the issue of privilege:

The petition, at its core, seeks records relating to Akin's work done in connection with coming to the conclusions in the Akin Opinion, and its efforts to advocate on behalf of Fortenova (and regarding SBK ART) before OFAC and the EU Council. This is lobbying and an investigation and, by definition, not privileged. And, to the extent any instructions or communications with Fortenova in relation to the Akin Opinion were privileged, Fortenova affirmatively waived the protection when it produced the Akin Opinion in one of the Dutch proceedings against SBK ART. Petitioner does not seek exhaustive records from all aspects of Akin's relationship with Fortenova, as Akin protests. Moreover, privilege on a document-by-document basis need not be considered at this stage. It is sufficient that there is clearly some relevant and non-privileged material.

(ECF 42, Petitioner's Supp. Response at 1-2.)

### ii.   Foreign Sanctions Law

Respondents assert that the burdens of production due to the risk of sanctions

outweigh any potential relevance to the information being sought. (*See* ECF 22, Respondents'

Opp. at 24-25.)

As noted above, Petitioner's foreign law expert dismisses as "completely unfounded"

Respondents' argument that they face potential liability for EU and U.K. sanctions violations if

they produce documents to Petitioner. (ECF 33, Petitioner's Reply at 14; ECF 33-3, Al-Karim

Decl. ¶ 42.)

### iii.  Scope of the Proposed Subpoenas

On the question whether the proposed subpoenas would require Respondents to have

to review an unreasonably large volume of documents, Respondents make the following points:

1) 169 current and former Akin timekeepers have collectively billed nearly 30,000 hours to

**SPA-39**

Fortenova Group for legal services; 2) a search of just the billing partner's files from January 2019 to the present applying the terms "Fortenova" and "FNG" yielded over 90,000 documents; 3) of the documents in that sample set, 44% are uniquely possessed by Akin (communications and documents sent and received only within Akin) and 26% were shared with third parties other than Fortenova Group and the EU Council (including Fortenova's other legal counsel and advisors whose work was done at the direction of counsel); and 4) to identify non-privileged documents, Akin would have to review all documents and determine which (or which parts) are privileged. (*See* ECF 38, Respondents' Response at 2-4.)

Petitioner states: "Akin's quick math about the number of documents that would need to be reviewed based on the search term 'Fortenova' misses the point entirely. The search terms that would matter most are 'SBK,' 'Sberbank,' 'Alketbi' and 'sanction.'" (ECF 42, Petitioner's Supp. Response at 2.)

At oral argument, Respondents stated that running Petitioner's proposed search terms over the billing partner's files yielded similar results to their initial searches (over 70 thousand documents).

b. *Analysis*

Petitioner's response to two of the burdens raised by Respondents – that the proposed subpoenas would chill communications between lawyers and their clients and discourage clients from hiring the foreign office of American law firms – is essentially that this is a risk Respondents have assumed based on the nature of their multinational firm and the way they structured their operations. (*See* ECF 33, Petitioner's Reply at 13-14.) I do not find this position to adequately address the very real policy concerns raised by the Second Circuit and courts in

40

**SPA-40**

this District when considering Section 1782 petitions. *See, e.g., Kiobel*, 895 F.3d at 247 (noting that "[t]he Supreme Court has stressed the need for 'full and frank communication between attorneys and their clients,' which 'promote[s] broader public interests in the observance of law and administration of justice'"); *In re Sarrio, S.A.*, 119 F.3d 143, 146 (2d Cir. 1997) (explaining that the "policy of promoting open communications between lawyers and their clients . . . would be jeopardized if documents unreachable in a foreign country became discoverable"). However, those concerns would not apply to Akin in its role as a lobbyist rather than lawyer; nor would those concerns apply to the extent that Akin's legal counsel provided business or other non-legal advice. *See, e.g., In re Degens*, 2020 WL 4252725, at *4-6 (granting a petitioner's request for discovery from a law firm that represented the petitioner's adversary in the foreign proceeding where the law firm had performed non-legal work); *In re Lane*, 2022 WL 16737132, at *3-5 (granting a petition seeking discovery from law firm that represented a party to the foreign litigation in part because the firm had done some non-legal work for the party). Even with regard to Akin acting in its role as legal counsel, those concerns are not dispositive, and limited discovery of non-privileged materials may still be appropriate after balancing the needs of Petitioner and the burdens on Respondents.

As to Respondents' argument that production would place them at risk of violating foreign sanctions law, as I explained above, I am unpersuaded. *See supra* Section II(B)(3)(b).

Petitioner is also correct that it has shown that the requested discovery is relevant and that the litigation stakes are high (*see* ECF 33, Petitioner's Reply at 15), which means that any arguments by Respondents that complying with the proposed subpoenas would be time-consuming or expensive because of the "morass of privilege issues" and "inevitable disputes

41

**SPA-41**

over privilege and choice of law questions" are unlikely to carry the day. *See, e.g., In re BM Brazil*, 2024 WL 555780, at *17 (noting that the assertion that production would require a "labor-intensive search of thousands of documents some of which may have to be redacted" was not sufficient to demonstrate undue burden in a high-stakes commercial litigation); *In re Valitus, Ltd*., No. 20-MC-91133 (FDS), 2020 WL 6395591, at *9 (D. Mass. Nov. 2, 2020) (holding that compliance with the subpoena would not be unduly burdensome for a respondent that "operate[d] a highly sophisticated worldwide enterprise").

Here, I directed Respondents to address "the specific nature of the burdens that Respondents would face if the Court were to permit issuance of subpoenas for discovery relating to non-privileged materials either (i) 'uniquely possessed by Akin' or (ii) shared only 'with third parties other than' Fortenova Group and the European Union Council." (ECF 35, Order.) Akin responded that for the set of documents from the files of the billing partner that contained certain search terms, 44% of the documents are uniquely possessed by Akin and 26% were shared with third parties other than Fortenova Group and the EU Council; and that the "vast majority of documents in the first category would be protected from disclosure, in whole or in part, by attorney-client privilege and/or the attorney work product doctrine, and the second category may be similarly protected depending on who the third party was with whom the materials were shared." (ECF 38, Respondents' Response at 2-4.) I do not believe that this qualified representation is sufficient to conclude that the burden on Respondents of providing relevant non-privileged discovery is disproportionate to the needs of the Foreign Proceedings, particularly if the required discovery is limited in accordance with my recommendations below.

42

**SPA-42**

To the extent production in this matter raises privilege issues, it is likely that they can be addressed through narrowing the scope of the proposed subpoena and relaxing the requirements for a privilege log – which are preferable to simply recommending that the Application be denied. *See Mees*, 793 F.3d at 302 (explaining that it is better for a court to issue "a closely tailored discovery order rather than . . . simply deny[ ] relief outright"). While I recognize that for a law firm to create a privilege log for its own document production would require substantial work, the burden would be reduced if the parties agreed that Respondents could use an appropriately simplified privilege log. *See* Local Civil Rule 26.2.

> c.  *Suggested Limitations on the Scope of the Proposed Subpoenas*

At oral argument, I stated that I was inclined to recommend granting some discovery and asked the parties if they wanted my thoughts on the reasonable scope of discovery before they met and conferred. They said that they wanted my guidance, without prejudice to making any appropriate objections to my report and recommendation and, on Respondents' part, to seeking reimbursement for costs of any required production.

I believe that Petitioner has shown that paper discovery on the following topics is likely to be relevant to the Malta Action and/or the EU Action: (1) Mr. Alketbi's acquisition of Petitioner; (2) the Akin Opinion; and (3) the Corporate Changes. (A deposition on those topics plus Respondents' document production would similarly be relevant.) My view is that the relevant period for document production should be from February 1, 2022 (shortly before Mr. Alketbi's acquisition of Petitioner) to December 31, 2023 (shortly after the sale of MidCo), which seems to be the period during which there are most likely to be responsive documents on those topics. Petitioner has not persuaded me that the other topics listed in the proposed

43

**SPA-43**

subpoenas (over the longer period) are likely to be particularly relevant to the Foreign

Proceedings, which involve whether Petitioner was improperly sanctioned by the EU and

whether Petitioner was improperly deprived of its voting rights and thereby harmed by the

Corporate Changes. I expect that Respondents would be able to identify the professionals who

worked on those three matters, meaning that it seems unlikely Respondents would have to

search all timekeepers who billed time to Fortenova Group matters.

Respondents' opposition to the Application suggests another possible limitation on the

scope of the proposed document subpoenas: production of non-privileged materials either

"uniquely possessed by Akin" or shared only "with third parties other than" Fortenova Group

and the EU Council. (*See* ECF 22, Respondents' Opp. at 12-13, 15-21.) As noted above, I do not

believe that documents shared by Respondents with the European Council (if any) are

protected from production. I therefore recommend granting the Application, with the proposed

subpoenas narrowed to cover the topics listed above over the shorter timeframe, and with

production limited to non-privileged materials that are uniquely possessed by Akin or that have

been shared with third parties other than Fortenova Group. To the extent that Respondents

believe that any such responsive documents are privileged, they should meet and confer with

Petitioner and place them on a privilege log; I encourage the parties to agree to a simplified

privilege log. *See* Local Civil Rule 26.2.

While Petitioner cites caselaw holding that Section 1782 discovery is not precluded even

when a party to the underlying foreign case possesses some of the documents (*see* ECF 37,

Petitioner's Response at 7-8), I believe that in this matter, it is appropriate to exclude from the

required discovery any documents that were shared with Fortenova Group; given the burdens

44

**SPA-44**

associated with the production due to the volume of documents held by Respondents, I conclude that this limitation on the required discovery is warranted due to the proportionality requirement.

I do not believe that at this stage I need to address the question whether documents shared with Fortenova Group's foreign legal counsel and advisors are, as a general matter, privileged under relevant foreign law. I encourage the parties to meet and confer on this topic as well as on an appropriately simplified privilege log. *See* Local Civil Rule 26.2. If necessary, the parties can come back to the Court with any discovery disputes they are unable to resolve after meeting and conferring.

Based on the analysis above, I conclude that the fourth *Intel* Factor supports granting the Application, with narrowed proposed subpoenas.

***

I conclude that the first *Intel* Factor cuts against granting the Application, while the final three *Intel* Factors favor granting the Application. In deciding whether the *Intel* Factors, on balance, support granting the Application, I am mindful that Second Circuit has said that "the Intel factors are not to be applied mechanically" and that courts "should also take into account any other pertinent issues arising from the facts of the particular dispute." *Kiobel*, 895 F.3d at 245. In my view, this admonition means that I should not recommend denying the Application reflexively, merely because Akin is a law firm retained by a party to the foreign proceeding. Indeed, Courts in this District have required law firms to provide Section 1782 discovery even when the first *Intel* Factor favored the respondents if the other three *Intel* factors favored the

45

**SPA-45**

petitioners. *See, e.g., In re Degens*, 2020 WL 4252725, at *4-6; *In re Lane*, 2022 WL 16737132,

at *3-5 (S.D.N.Y. Nov. 7, 2022).

In this matter, I think a "pertinent issue arising from the facts of the particular dispute"

is that Akin drafted the Akin Opinion, which a Fortenova Group entity provided to a Dutch court

to contest Petitioner's right to exercise its voting rights and possibly also to the EU Council in

connection with the Council's consideration of whether to sanction Petitioner; the Akin Opinion

stated that documents provided by Mr. Alketbi explaining the purchase were (1) "insufficient to

confirm" that his acquisition demonstrates that Petitioner should "no longer be[ ] subject to the

asset freeze restrictions imposed on its purported (former) parent company Sberbank" and (2)

"indicative of criminal sanctions breaches having been committed by EU persons . . . ." (ECF 13

Ex. 1, Petitioner's Mem. at 7-8.) My view is that Fortenova Group's affirmative use of the Akin

Opinion by sharing it with the Dutch court and possibly the EU Council moves Akin's work on

the Akin Opinion out of the category of legal advice provided by legal counsel; under U.S. law, if

it applies, it is possible that Fortenova Group's public use of the Akin Opinion effected a subject

matter waiver of any privilege attaching to documents relating to the Akin Opinion (and by

extension to documents concerning Mr. Alketbi's acquisition of Petitioner). *See, e.g., In re Leslie*

*Fay Cos., Inc. Sec. Litig.*, 161 F.R.D. 274, 283, 284 (S.D.N.Y. 1995) (holding that the submission to

the Securities and Exchange Commission of an accounting report prepared by the company's

audit committee and outside counsel waived attorney-client privilege over the report and its

underlying documents, to the extent that the underlying documents contained no legal analysis

or advice beyond what was discussed in the report). Even if there were no such waiver, the

public use of the Akin Opinion means that the work relating to the Akin Opinion and Mr.

46

**SPA-46**

Alketbi's acquisition of Petitioner becomes something more like the discoverable work of a lawyer acting as a lobbyist or business advisor.

One of the concerns raised by Respondents in connection with the first *Intel* Factor is that it is problematic to order production of "documents that are possessed by Akin exclusively by virtue of its representation of Fortenova," especially if the documents are undiscoverable from the client abroad, because requiring production would disturb the attorney-client relationship. (ECF 22, Respondents' Opp. at 15.) However, where, as with documents relating to the Akin Opinion and Mr. Alketbi's acquisition of Petitioner, the discovery does not seek materials protected on the basis of privilege or the work product doctrine, requiring production would not disturb the attorney-client relationship. Likewise, one of the burdens raised by Respondents in connection with the fourth *Intel* Factor – that the proposed subpoenas would chill communications promoting compliance with the law between lawyers and their clients – is not in my view applicable to Akin's work relating to the Akin Opinion or Mr. Alketbi's acquisition of Petitioner.

While it may be that most documents relating to the Corporate Changes will be privileged or reflect attorney work product, it seems plausible, given Akin's apparently active role in Fortenova Group's corporate maneuvers relating to Petitioner, that Respondents could have a meaningful number of non-privileged documents relating to the Corporate Changes as well. I believe that Respondents should be required to perform a reasonable search for such documents, for the same reasons described above in connection with my analysis of documents relating to the Akin Opinion and Mr. Alketbi's acquisition of Petitioner.

**SPA-47**

In making my recommendation, I am also guided by the Second Circuit's instruction that, "[i]n exercising its discretion, a district court should consider the 'twin aims' of § 1782: (1) providing efficient means of assistance to participants in international litigation and (2) encouraging foreign countries to provide such assistance to our courts." *Mees,* 793 F.3d at 297-98. I believe that authorizing limited discovery better serves those twin aims than denying all discovery requested in the proposed subpoenas.

For the foregoing reasons, I conclude that the discretionary factors support granting the Application, with narrowed proposed subpoenas. To the extent that, in the course of responding to the narrowed subpoenas, Respondents find that the burdens are undue, based on a high number of documents responsive to a particular request that need to be reviewed for privilege or a high proportion of documents that are protected from production based on privilege, Respondents may seek relief from the Court if necessary after meeting and conferring with Petitioner.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that the Application be GRANTED and that Petitioner be authorized to serve on Respondents subpoenas that are modified as described herein.

DATED:    July 30, 2024
          New York, New York

**ROBYN F. TARNOFSKY**
**United States Magistrate Judge**

48

**SPA-48**

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO REPORT AND RECOMMENDATION**

The parties shall have fourteen days (including weekends and holidays) from service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure to this report and recommendation. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Engelmayer.

THE FAILURE TO OBJECT WITHIN FOURTEEN DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).

**SPA-49**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

*IN RE* EX PARTE APPLICATION OF SBK ART LLC

24 Misc. 147 (PAE) (RFT)

OPINION & ORDER

------------------------------------------------------------

PAUL A. ENGELMAYER, District Judge:

This case involves an application under 28 U.S.C. § 1782 for discovery in aid of foreign proceedings. Petitioner SBK ART LLC ("SBK") seeks documents and deposition testimony from a law firm, respondent Akin Gump Strauss Hauer & Feld, LLP, and its affiliate, Akin Gump, LLP (collectively, "Akin"). SBK seeks these for use in pending civil proceedings in Malta and the General Court of the European Union and contemplated civil proceedings in the Netherlands. It contends that these materials would support its claim in foreign litigation that Akin waged an advocacy campaign, on behalf of SBK's corporate adversaries, to have SBK sanctioned by the EU Council as part of a scheme to dilute SBK's ownership position in a Croatian company, Fortenova Grupa d.d. ("Fortenova").

On April 3, 2024, the Court referred SBK's application to United States Magistrate Judge Robyn Tarnofsky. Dkt. 14. After extensive briefing and argument, Judge Tarnofsky issued a Report and Recommendation. Dkt. 46 (the "Report"). It recommends that the Court (1) grant a portion of SBK's discovery application, in particular, its request for materials relating to Akin's relevant lobbying efforts; but (2) deny discovery as to the substantial majority of the application, including to the extent the application sought materials relating to Akin's provision of legal services.

Akin has filed objections to the Report, Dkt. 51 ("Akin Obj."), to which SBK has responded, Dkt. 55 ("SBK Response"). SBK does not challenge the aspects of the Report that are adverse to it, that is, the limits on discovery that the Report proposes.

For the reasons that follow, the Court adopts Judge Tarnofsky's thorough and well-reasoned Report in its entirety. It accordingly authorizes SBK to obtain discovery from Akin, but only within tightly defined parameters.

## I.    Background[1]

The following summary focuses on the facts necessary for an assessment of the limited issues presented.

### A.    The Parties

The foreign proceedings in aid of which SBK seeks discovery here center on a battle for corporate control of Fortenova, a food and retail company based in Zagreb, Croatia, which operates in several countries in southeastern Europe. Report at 2. SBK, a Russian entity, claims it is the rightful owner of an approximately 42% interest in Fortenova through its ownership of depositary receipts. *Id.*

---

[1] The facts summarized in this section are primarily drawn from the Report, Dkt. 46, Akin's objections, Dkt. 51, and the attached declaration of Robert H. Pees, Dkt. 52, and SBK's response, Dkt. 55. The Court has also considered the parties' pleadings and voluminous submissions to Judge Tarnofsky, including the Petition, Dkt. 8 ("Pet."), and the attached declarations of Michael A. Piazza, Dkt. 3 ("Piazza Decl."), and Gabriel Lansky, Dkt. 4 ("Lansky First Decl."); SBK's brief in support, Dkt. 6, Akin's brief in response, Dkt. 22, and the attached declarations of Liz Osborne, Dkt. 23 ("Osborne Decl."), Ross Denton, Dkt. 24 ("Denton Decl."), Daniel Buttigieg, Dkt. 25 ("Buttigieg Decl."), Christiaan Zijderveld, Dkt. 26 ("Zijderveld Decl."), and Robert H. Pees, Dkt. 27; and SBK's reply brief, Dkt. 33, and the attached declarations of Robert S. Landy, Dkt. 33-1, Gabriel Lansky, Dkt. 33-2 ("Second Lansky Decl."), Ali Al-Karim, 33-3 ("Al-Karim Decl."), Elbert Jan Hendrick Zandbergen, Dkt. 33-4 ("Zandbergen Decl."), and John Refalo, Dkt. 34-5 ("Refalo Decl."); Akin's Responses to Judge Tarnofsky's Orders of July 1 and July 8, 2024, Dkts. 37, 38, and the attached declarations of Ross Denton, Dkt. 39 ("Second Denton Decl."), Richard Hornshaw, Dkt. 40, and Robert H. Pees, Dkt. 44; and SBK's Response to Judge Tarnofsky's Orders of July 1 and July 8, 2024, Dkt. 43.

2

Akin is a multinational law firm. Its London office has advised Fortenova on "issues arising from the presence of sanctioned holders in its capital structure." *Id.* at 3 (quoting Osborne Decl. ¶ 6). Akin is also a registered lobbyist for Fortenova, including in the United States. *Id.*

### B.    SBK Is Sanctioned by the EU and Frozen Out of Fortenova

In April 2022, the Russian bank PJSC Sberbank of Russia ("Sberbank") placed its Fortenova holdings into its wholly owned special purpose vehicle, SBK. *See id.* at 2; Osborne Decl. ¶ 7. At the time, the second-largest minority owner of Fortenova was Open Pass Limited ("Open Pass"), a Maltese company owned by Pavao Vujnovac. *See* Report at 2; Dkt. 13-1, at 2.

After Russia's invasion of Ukraine in 2022, the United States, the United Kingdom, and the European Union ("EU") placed Sberbank on their respective sanctions lists. Report at 2. Thereafter, Sberbank sold its stake in SBK to Saif J.S.M. Alketbi ("Alketbi"), a United Arab Emirates-based businessman. *Id.* On December 16, 2022, the EU Council added SBK to its list of sanctioned entities, on the grounds that (1) Sberbank still retained "effective control" over SBK and (2) that Sberbank had rendered financial assistance to the Russian Federation. *See id.* at 4; *see* Denton Decl. ¶ 7. Alketbi was not individually sanctioned. *See* Report at 4–5.

SBK alleges that, at Vujnovac's behest, Fortenova moved to block SBK from exercising its voting rights in Fortenova, on account of its sanctioned status. *See id.* at 3–4. SBK alleges that, stripped of its voting rights, it was powerless to block major changes to Fortenova's corporate structure, and that these resulted, in January 2023, in the Vujnovac-controlled Open Pass gaining control of Fortenova (the "Corporate Changes"). *Id.* at 4–5. In December 2023, Open Pass arranged for the sale of a Fortenova entity at an artificially depressed price. *Id.*; Dkt. 13-1, at 12. That, SBK claims, benefitted Open Pass and Fortenova insiders at the expense

3

**SPA-52**

of minority shareholders, including SBK. *See* Report at 5. As a result of these transactions, SBK alleges, its stake in Fortenova has been dramatically devalued. *See id.*

### C. Akin's Role in the Alleged Scheme

SBK claims that Akin assisted Vujnovac in his alleged scheme to seize corporate control of Fortenova by exploiting the EU sanctions regime. *See id.* at 3–5. It claims that Vujnovac-affiliated entities and Fortenova's management, allegedly beholden to Vujnovac, directed Akin to lobby the EU Council to sanction SBK. *Id.* As alleged, the lobbying attempted to advance the narrative that SBK remained under Sberbank's control, because its nominal sale to Alketbi had not been a legitimate arm's-length transaction. *Id.*

SBK alleges that these lobbying efforts succeeded. It alleges that, in sanctioning SBK, the EU Council centrally relied on an opinion issued by Akin (the "Akin Opinion"), to the effect that, even after Sberbank had sold its stake in SBK to Alketbi, SBK could not be considered independent of Sberbank. *Id.* at 4. The Akin Opinion had concluded that documents produced by Alketbi in connection with the acquisition were "insufficient to confirm that the transaction . . . [has] resulted in SBK no longer being subject to the asset freeze restrictions imposed on its purported (former) parent company Sberbank[.]" SBK Response at 6–8. Alketbi had previously provided the documents relied upon by the Akin Opinion to Fortenova. That these ended up in Akin's hands, SBK claims, supports that Fortenova had enlisted Akin "in a plan to deny Mr. Alketbi his voting and ownership rights" by lobbying the EU Council to sanction SBK. *Id.* at 7. SBK argues that, considering "the short period of time" between the issuance of the Akin Opinion (December 14, 2022) and the EU's introduction of sanctions against SBK (December 16, 2022), the Akin Opinion "could have ended up with the Council . . . only through the Fortenova management." Report at 4.

4

**SPA-53**

### D.    Pending and Anticipated Foreign Litigation

SBK seeks discovery here in aid of pending civil suits in Malta and the EU, and anticipated proceedings in the Netherlands.

First, in the Civil Court of Malta, SBK has sued Open Pass and Fortenova for damages caused by the approval of the Corporate Changes (the "Malta Action"). *See* Report at 12. In that action, SBK challenges the transactions by which it was ousted from its ownership position in Fortenova. Its central claim is that Open Pass "devised and perpetrated a scheme to move all valuable assets of the Fortenova Group to a new entity owned and controlled by Mr. Vujnovac at a fraction of its true, fair value." Dkt. 6 at 7.

Second, in the General Court of the European Union, SBK seeks annulment of the sanctions imposed by the EU Council (the "EU Action"). *See* Report at 12. SBK there alleges that it was wrongfully sanctioned based on its earlier association with Sberbank, notwithstanding the fact that Sberbank had sold its stake in SBK to Alketbi.

Third, SBK anticipates filing an action in the Netherlands or another court outside the United States to seek damages caused by the Corporate Changes and other aspects of Fortenova's corporate governance. *See id.* at 7.

### E.    The Instant Petition

On March 26, 2024, SBK filed a petition under 28 U.S.C. § 1782, demanding that Akin produce documents, and submit to deposition testimony, relating to Akin's work in connection with the Akin Opinion, and its efforts to advocate on behalf of Fortenova (and regarding SBK) before the EU Council. *See* Pet.; Dkt. 3, Ex. H.

As to documents, the Petition sought documents—covering the period January 1, 2019 to the present—on the following topics: (1) Alketbi's acquisition of SBK, the Corporate Changes, and Open Pass's control of Fortenova Group, including communications on those topics between

5

Akin and other entities; (2) Akin's lobbying efforts on behalf of Fortenova Group in the United States, the United Kingdom, or the European Union; and (3) communications between Akin and the U.S. Department of Treasury's Office of Foreign Assets Control, the U.S. State Department, the Dutch Ministry of Finance, the U.K. Office of Financial Sanctions Implementation, the National Bank of Serbia, Croatian government officials and staff, and EU officials and staff. Dkt. 3, Ex. H.

As to deposition testimony, the Petition sought such from Akin about (1) its role in analyzing Alketbi's acquisition of SBK; (2) its role, responsibilities, and lobbying efforts on behalf of the Fortenova Group in the United States, the United Kingdom, the European Union, or before any other relevant authority, including the U.S. Department of Treasury's Office of Foreign Assets Control, the U.S. State Department, the Dutch Ministry of Finance, the U.K. Office of Financial Sanctions Implementation, the National Bank of Serbia, Croatian government officials and staff, and EU officials and staff; (3) the support for its conclusion in the Akin Opinion that Sberbank effectively controls SBK; (4) other information related to the Akin Opinion; (5) information provided to Akin concerning Alketbi's acquisition of SBK, the Corporate Changes, and Vujnovac's ownership and/or control over the Fortenova Group; (6) communications between Akin and a list of enumerated individuals and entities concerning Alketbi's acquisition of SBK, the Corporate Changes, and Vujnovac's ownership and/or control over the Fortenova Group; and (7) Akin's document production. *Id.*

F.    **Procedural History**

On March 26, 2024, SBK filed, along with the Petition, a memorandum of law in support, Dkt. 6.[2]  On April 3, 2024, the Court referred the Petition to Judge Tarnofsky.  Dkt. 14.  On May

---

[2] The previous day, SBK submitted a petition under § 1782 seeking discovery from Kroll LLC ("Kroll"), which the Court referred to Judge Tarnofsky. *In re SBK ART LLC*, No. 24 Misc. 142

6

**SPA-55**

6, Akin filed an opposition to the Petition. Dkts. 22–27. On May 31, 2024, SBK filed a reply.

Dkt. 33. On July 23, 2024, Judge Tarnofsky held argument. Dkt. 45.

On July 30, 2024, Judge Tarnofsky issued the Report, which recommended that the

Petition be granted, but with narrowed discovery parameters, as developed below. On August

27, 2024, Akin filed objections to the Report. Dkt. 51 ("Objections"). On September 20, 2024,

SBK responded to the objections. Dkt. 55 ("Response").

## II.    The Report

The Report's recommendation to authorize, but sharply limit, the discovery sought by

SBK is based on its application of familiar principles under § 1782.

### A.    Legal Framework

Section 1782 authorizes district courts to order discovery from third parties in the United

States for use in foreign proceedings. In relevant part, it provides as follows:

> The district court of the district in which a person resides or is found may order him
> to give his testimony or statement or to produce a document or other thing for use
> in a proceeding in a foreign or international tribunal, including criminal
> investigations conducted before formal accusation. The order may be made
> pursuant to a letter rogatory issued, or request made, by a foreign or international
> tribunal or upon the application of any interested person . . . . To the extent that the
> order does not prescribe otherwise, the testimony or statement shall be taken, and
> the document or other thing produced, in accordance with the Federal Rules of Civil
> Procedure.

28 U.S.C. § 1782(a). The statute thus imposes three prerequisites to the issuance of a foreign

discovery order. *See, e.g., In re Microsoft Corp.*, 428 F. Supp. 2d 188, 192 (S.D.N.Y. 2006).

First, the target must "reside" or be "found" in this District. Second, the evidence sought must

be "for use" in a proceeding in a foreign or international tribunal. *See ZF Auto. US, Inc. v.*

---

(PAE) (RFT) (the "Kroll Petition"). After the parties notified Judge Tarnofsky that Kroll did not
oppose the Kroll Petition, she issued a Report and Recommendation, which recommended that it
be granted. *Id.*, Dkt. 12. Kroll thereafter sought, and the Court granted, an extension of its time
to file objections to Judge Tarnofsky's Report until a decision issued in this action. *Id.*, Dkt. 30.

*Luxshare, Ltd.*, 596 U.S. 619, 633 (2022). Third, the application must be made by a foreign tribunal or "any interested person." *Schmitz v. Bernstein, Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83 (2d Cir. 2004) (citation omitted).

Once those prerequisites have been satisfied, a district court has "broad discretion over the issuance of discovery orders pursuant to § 1782." *In re Edelman*, 295 F.3d 171, 181 (2d Cir. 2002). In *Intel Corp. v. Advanced Micro Devices, Inc.*, the Supreme Court set out four factors to guide district courts in exercising this discretion:

> (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," in which event "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad";
>
> (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court assistance";
>
> (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and
>
> (4) whether the request is "unduly intrusive or burdensome."

542 U.S. 241, 264–65 (2004). These "factors are not to be applied mechanically," and a district court "should also take into account any other pertinent issues arising from the facts of the particular dispute." *Kiobel v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 245 (2d Cir. 2018). A district court's discretion should be exercised sensitive to the statute's "twin aims" of "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Id.* at 244 (quoting *In re Metallgesellschaft*, 121 F.3d 77, 79 (2d Cir. 1997)).

8

**SPA-57**

## B.    The Report's Findings

*Statutory and* Intel *Factors.* The Report found that the Petition satisfied § 1782(a)'s statutory requirements, and that, on balance, the *Intel* discretionary factors favored granting discovery to SBK. The Petition met the statutory requirements, the Report found, because (1) Akin is found in this District, (2) the discovery sought would be "for use" in the Malta and EU litigation, and (3) SBK is an "interested party." Report at 11–21.

The Report found that all discretionary factors but one favored granting the Petition. The first factor disfavored relief, the Report found, because "many of the documents sought by the proposed subpoenas could be demanded by" SBK from Fortenova in foreign proceedings. Report at 29 (citing *Kiobel* 895 F.3d at 245); *cf. Klein v. Altara RK Invs. Ltd.*, No. 24-228-cv, 2025 WL 560105, at *2 (2d Cir. Feb. 20, 2025) ("[W]hen discovery requests are submitted to non-parties pursuant to § 1782, the district court should consider whom the documents are actually being sought for use against."). But, it concluded, the remaining three factors, which favored granting relief, outweighed the first. The second and third favored SBK, the Report found, because Akin had not provided "authoritative proof" that the courts in the Malta Action and the EU Action would reject evidence obtained through this proceeding nor did Akin support its claim that SBK "[wa]s acting in bad faith to try to misuse Section 1782" to circumvent UK and EU sanctions regimes. *Id.* at 34–35. And, although the Petition as-filed was overbroad in the discovery it sought, the Report found, that defect was curable. The fourth *Intel* factor therefore did not require outright denial of the Petition. *See, e.g., Mees v. Buiter*, 793 F.3d 291, 302 (2d Cir. 2015) ("[I]t is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright." (citation omitted)). Rather, the Report concluded, provided that the discovery parameters were adjusted to closely

9

track the valid litigation needs identified by the Petition, the burden on Akin would be proportionate to SBK's need for discovery. *See* Report at 35–42. On that premise, the Report concluded, the fourth *Intel* factor also favored SBK. *Id.* at 45.

*Discovery Limitations.* As to the fourth factor, the Report recommended narrowing discovery as follows, to ease the burden on Akin. First, document discovery is to be limited to non-privileged materials uniquely possessed by Akin, or that were shared with third parties other than Fortenova, between February 1, 2022 and December 31, 2023 (the "Relevant Period"), and that related to: (1) Alketbi's acquisition of SBK, (2) the Akin Opinion, or (3) the Corporate Changes. *See id.* at 43. Second, as to deposition discovery, it recommended authorizing a single deposition on (1) the above topics, limited to the Relevant Period, and (2) Akin's document production. *Id.*

*Kiobel.* The Report found that the Second Circuit's decision in *Kiobel* supported authorizing *limited* discovery. *Kiobel*, the Report observes, cautions against granting discovery where a petition seeks records from a law firm retained by the petitioner's foreign-litigation adversary, but it does not require a "reflexive[]" denial of such bids. Report at 45; *cf. Kiobel*, 895 F.3d at 248 (denying § 1782 petition where "*Intel* factors, the respect owed to confidentiality orders, and the concerns for lawyer-client relations" all weighed against granting discovery). And here, the Report found, the distinct circumstances distinguished this Petition from *Kiobel*. Principally, Fortenova's "affirmative use of the Akin Opinion by sharing it with the Dutch court and possibly the EU Council move[d] Akin's work on the Akin Opinion out of the category of legal advice provided by legal counsel." Report at 46. And the limited discovery that the Report proposed be authorized would focus on "the discoverable work of a lawyer acting as a lobbyist or business advisor," rather than as legal counselor. *Id.* at 46–47.

10

**SPA-59**

The Report thus recommended granting—albeit with major limitations—the Petition's § 1782 application for discovery.

## III.   Discussion

Akin makes three main objections to the Report. Each, it argues, requires the outright denial of the Petition. First, Akin argues that the Petition does not meet § 1782's second statutory requirement—that the requested discovery be "for use" in a foreign proceeding. Akin Obj. at 22. Second, it argues that the Report, in analyzing the third *Intel* factor, did not consider relevant "foreign proof-gathering restrictions." *Id.* at 19. Third, it argues that *Kiobel* requires denial of the Petition, even with the narrowed discovery parameters recommended by the Report. *See id.* at 9, 16, 22.

For the following reasons, Akin's objections, singly or jointly, do not support denying the Petition altogether. Rather, the Report's recommendation to authorize limited discovery is (1) firmly anchored in § 1782's statutory and discretionary factors and (2) consonant with *Kiobel*.

### A.   Statutory "For Use" Requirement

Akin first objects to the Report's finding that the Petition meets § 1782's requirement that the evidence sought be "for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a). Akin argues that the documents sought by SBK are not "for use" in the Malta and EU actions because (1) they are not "relevant" to the subject matter of those proceedings; (2) if SBK's sale to Alketbi had been legitimate, as SBK claims, SBK would have corroborating evidence of that and would not need documents from Akin to challenge the EU Council's contrary finding; and (3) the foreign proceedings are "frivolous." These arguments are easily put aside.

11

**SPA-60**

First, SBK has satisfactorily explained why the discovery that the Report approves is relevant to the ongoing foreign litigation: to support its theory there that Vujnovac and Open Pass, with Akin's assistance, improperly seized corporate control of Fortenova by exploiting the EU sanctions regime. With respect to the Malta Action, the discovery at issue may provide evidence of a scheme to block SBK from exercising the voting rights associated with its ownership interests in Fortenova. Refalo Decl. ¶ 5. And with respect to the EU Action, the materials may support SBK's claim that Akin lobbied the EU Council, at Vujnovac's behest or as a result of his influence on Fortenova, to sanction SBK to facilitate the Corporate Changes. Second Lansky Decl. ¶ 20. As SBK explains, "the EU Council's apparent reliance on the Akin Opinion in making its initial determination, Akin's conclusions and how it reached them are clearly germane to any challenge to the basis for the EU Council's ruling." SBK Response at 5. These showings satisfy Section 1782's "for use" requirement. As the Second Circuit has explained, evidence is "for use" in a foreign proceeding if it can "be employed with some advantage or serve some use in [that] proceeding." *Mees*, 793 F.3d at 298; *see also, e.g., In re Asia Maritime Pacific Ltd.*, 253 F. Supp. 3d 701, 706 (S.D.N.Y. 2015) ("[D]iscovery is 'for use' in a foreign proceeding if it is relevant to the subject matter of the proceeding, and the evidence would increase the applicant's chances of success in the proceeding." (citation omitted)); *In re DNG FZE*, No. 23 Misc. 435 (PAE), 2024 WL 124694, at *3 (S.D.N.Y. Jan. 11, 2024) ("§ 1782 applicant must establish a practical use in the foreign proceeding for the discovery it seeks.").

Second, Akin mischaracterizes SBK's Petition in arguing that, to challenge the EU Council's sanctions determination, SBK does not "need" documents in Akin's possession. Obj. at 18. In the foreign proceedings, SBK seeks to show not only that the EU Council erred in finding Sberbank's sale of SBK to Alketbi illegitimate. It also seeks to show that this error

12

**SPA-61**

derived, in part, from improper pressure exerted by Akin, at the behest of Vujnovac, to advance his scheme to seize control of Fortenova. Second Lansky Decl. ¶ 20; *see also* SBK Response at 6–8; Report at 3–6. Akin may hold communications tending to support these propositions that SBK and Fortenova do not possess. Akin may possess documents revealing what prompted it to draft the Akin Opinion. And Akin may possess documents that, although not shared with Fortenova or the EU Council, shaped its conclusions in the Akin Opinion and/or evince its methodology. As the Report rightly notes, it is "not impossible" to envision "non-privileged documents never seen by Fortenova Group that could provide evidence of a scheme that culminated in the Corporate Changes," Report at 20, and such documents could be "employed with some advantage" in the foreign proceeding, *Mees*, 739 F.3d at 298.

Third, Akin terms SBK's foreign litigation "frivolous." Akin Obj. at 1. It argues that the fact that SBK has initiated eight different proceedings abroad exposes the Petition as a "ruse for obtaining discovery" for use in foreign proceedings other than those mentioned in the Petition. *Id.* at 24–25. The record evidence, however, does not support that the foreign proceedings on which the Petition relies—the Malta Action, the EU Action, and the contemplated Netherlands Action—are "abusive," *id.* at 24. That additional foreign proceedings exist does not undermine that the evidence sought here is "for use"—and has a viable use—in the actions on which the Petition relies. And the record does not support that the Petition was brought in bad faith or is "meant to harass" Akin or Fortenova. *Gorsoan Ltd. v. Bullock*, 652 F. App'x 7, 9 (2d Cir. 2016); *see also In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 135 (2d Cir. 2017) (placing onus on "'parties concerned . . . that a Section 1782 applicant is attempting to use foreign litigation as a ruse for obtaining discovery' for use in other foreign proceedings" to "bring evidence of such chicanery to the . . . court's attention."); *see also Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d

13

**SPA-62**

1095, 1101 n.6 (2d Cir. 1995) ("[I]f the district court determines that a party's discovery application under section 1782 is made in bad faith, for the purpose of harassment, or unreasonably seeks cumulative or irrelevant materials, the court is free to deny the application in toto, just as it can if discovery was sought in bad faith in domestic litigation.").

The Court thus rejects Akin's objection based on the statutory "for use" requirement.

**B.     Third *Intel* Factor: Attempt to Circumvent Foreign Laws or Policies**

Akin next objects to the Report's finding that the third *Intel* factor weighs in SBK's favor. This factor asks "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." 542 U.S. at 264–65. Akin argues that the Report did not consider its arguments that (1) Maltese and Dutch attorney-client privilege law would prohibit the discovery sought by the Petition, and (2) UK and EU sanctions regimes would prohibit Akin from propounding discovery on SBK were this discovery requested in Malta or the EU. Dkt. 51. Akin mischaracterizes the Report, which rightly rejected these arguments.

First, contrary to Akin's slur that Judge Tarnofsky "improperly avoided an analysis of foreign proof-gathering restrictions," Akin. Obj. at 20, the Report did so. It thoroughly considered Akin's arguments (reprised here) as to foreign privilege and sanctions law. Thus, the Report considered, *inter alia*, the arguments that SBK "ha[d] already sought and been denied the requested discovery in foreign fora"; that SBK "would be unable to obtain any of the materials it requests in the foreign proceedings due to proof-gathering restrictions"; that SBK "is seeking discovery it is prohibited from receiving in the foreign fora"; and that EU law "could prohibit discovery of documents provided to the EU Council." Report at 31–36. The Report found these unsubstantiated, as reviewed below. *See id.* at 35; *see, e.g., Fed. Republic of Nigeria v. VR Advisory Servs., Ltd.*, 27 F.4th 136, 153 (2d Cir. 2022) ("[C]ircumvention occurs where the

14

**SPA-63**

applicant uses a § 1782 application to avoid measures that are intended to restrict certain means of gathering or using evidence."). That Akin's arguments failed does not support its false charge that they were ignored.

Second, Akin is mistaken that § 1782 requires the materials sought by the Petition to be discoverable under Malta and EU law. The Second Circuit has emphasized that "§ 1782 contains no foreign-discoverability requirement." *Mees*, 793 F.3d at 303. It does not require "that evidence sought in the United States . . . be discoverable under the laws of the foreign country that is the locus of the underlying proceeding." *In re Application for an Order Permitting Metallgesellschaft AG to Take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997). Rather, § 1782's reference to "proof-gathering restrictions [is] best understood" as encompassing "rules akin to privileges that *prohibit* the acquisition or use of certain materials, rather than as rules that *fail to facilitate* investigation of claims by empowering parties to require their adversarial and non-party witnesses to provide information." *Id.* at 303 n.20 (quoting *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80–81 (2d Cir. 2012)) (emphasis in original); *see also Euromepa*, 51 F.3d at 1101 ("[W]e do not think that the district court's concern for trespassing on the prerogatives of French sovereignty should have weighed so heavily in its decision. France can quite easily protect itself from the effects of any discovery order by the district court that inadvertently offended French practice.").

To the extent Akin faults the Report for not finding that the materials sought would necessarily be admissible in the Malta and EU actions, Akin misapprehends the governing standard. Just "as a district court should not consider the *discoverability* of the evidence in the foreign proceeding, it should not consider the *admissibility* of evidence in the foreign proceeding in ruling on a section 1782 application." *Brandi-Dohrn*, 673 F.3d at 82 (emphasis in original);

15

**SPA-64**

*Sampedro v. Silver Point Cap., L.P.*, 818 F. App'x 14, 17 (2d Cir. 2020) ("[O]ur precedents make clear[] [that] discovery need not be admissible to be for use in a litigation, as there is no statutory basis for such a requirement." (citation omitted)); *In re Accent Delight Int'l Ltd.*, 791 F. App'x 247, 251 (2d Cir. 2019) (same); *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 122 (2d Cir. 2015) (similar). Moreover, as the Report recognized, to the extent Akin seeks to make discrete claims as to foreign privilege law, it may pursue these by including these in a privilege log identifying assertedly privileged subsets of the discovery. That some discovery sought may prove privileged does not support an outright denial of relief. *See Mees*, 793 F.3d at 302; *In re Lane*, No. 22 Misc. 34, 2022 WL 16737132, at *3–5 (S.D.N.Y. Nov. 7, 2022).[3]

Third, Akin has not substantiated its claim that the Petition attempts an end run around applicable sanctions law in the United Kingdom and the EU.[4] In support, Akin submitted a declaration by Ross Denton, senior counsel in the London office of Van Bael Bellis LLP. He opines about "the effect" of UK and EU sanctions laws on "potential compliance with a subpoena issued by . . . a sanctioned entity." Second Denton Decl. ¶ 2. Based on parallel language in EU and UK laws, Denton opined that:

> The application of EU (and UK) sanctions does not prevent a designated person from being able to benefit from any legal rights afforded to it, but simply that it would be unlawful under EU (and UK) law for any EU (or UK) person to provide that designated person with funds or economic resources. A designated person can clearly bring an action in a court, but any measure or remedy, particularly one

---

[3] Section 1782(a) protects privileged material from disclosure. It states: "A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege." 28 U.S.C. § 1782(a).

[4] Sberbank has been sanctioned in the United Kingdom since April 2022. Denton Decl. ¶ 23. Akin's argument assumes that SBK is subject to the same designation as Sberbank, based on the EU Council's finding that it remains under Sberbank's effective control. *Id.* SBK disputes this assumption, but its argument does not depend on it. *See* Al-Karim Decl. ¶ 32.

16

involving transfer of funds or economic resources to that person, needs to be considered in the context of the sanctions.

*id.* ¶ 5; *see also* Denton Decl. ¶ 21. Denton, however, did not identify *any* authority holding that the prohibition on "transfer[ring] funds or economic resources" extends to providing discovery pursuant to a court order (much less a U.S. court order directed to Akin's U.S. office). Instead, his opinion surmises that "attorneys in Akin's UK office *could* face sanctions for providing 'economic resources' to SBK, because the clear intention of the [Petition] is to take material provided by Akin to assist in litigation that preserves or enhances SBK's commercial interests." Denton Decl. ¶ 25 (emphasis added); *see id.* at ¶ 34 (reasoning similarly as to EU sanctions). Denton's key assumption—that propounding discovery amounts to a "transfer of economic resources"—is, however, unsupported. And it is in tension with his representation that a sanctioned entity can "clearly bring an action in a court." Second Denton Decl. ¶ 5.

Denton's assumption is further undermined by legal authority identified in a declaration submitted by SBK's foreign-law expert, Ali Al-Karim, a barrister at Brick Court Chambers and a specialist in sanctions law. Al-Karim Decl. ¶¶ 1, 6–7. Al-Karim explains that, in *Mints v. PJSC Bank*, [2023] EWCA Civ 1132, the English Court of Appeal held that the prohibition on providing "funds and economic resources" to sanctioned entities does not apply to "normal judicial functions." Al-Karim Decl. ¶¶ 32–41; *see id.* ¶¶ 76–81 (EU law). Denton's declarations notably fail to engage with—they do not even mention—*Mints*. Akin's charge that SBK has engaged in bad-faith evasion of UK and EU law instead rests on supposition and *ipse dixit*.

In light of the above, the Report was clearly correct to find the weight of authority before the Court to favor approving discovery pursuant to § 1782:

> Respondents' experts speak in tentative terms about the possibility of sanctions violations because of laws against providing sanctioned entities with "funds and economic resources," while Petitioner's expert definitively takes the position,

17

which makes more sense, that sanctioned entities are entitled to seek and receive discovery to defend themselves.

Report at 36 (citing Denton Decl., Buttigieg Decl., Zijderveld Decl., and Al-Karim Decl.).[5] In other words, Akin has failed to substantiate its claim that EU and UK sanctions laws prohibit a sanctioned entity from "gathering or using evidence" to challenge the underlying sanctions determination. *See id.* ("Even Respondents do not appear to be saying that there is no way for them to produce the requested materials without a risk of sanctions—they seem to say that sanctions can be avoided if U.S. lawyers do the review and production . . . ."); *see also, e.g., In re Accent Delight*, 791 F. App'x at 251 ("Sotheby's has not provided any showing that the policy or restrictions of any relevant foreign jurisdiction prohibit the discovery sought by Petitioners."); *In re Hansainvest Hanseatische Inv. GmbH*, 364 F. Supp. 3d 243, 251 (S.D.N.Y. 2018) (Sullivan, J., sitting by designation) ("Respondents must illustrate not merely that the requested documents are not obtainable through German procedures, but that Applicants are engaged in a bad faith endeavor to misuse Section 1782."). *Compare Metallgesellschaft*, 121 F.3d at 80 ("[W]e will not speculate—particularly on the basis of an ambiguous affidavit submitted by [respondent's] German counsel—whether Hodapp enjoys a privilege under German law entitling him to refuse to comply with a discovery order under § 1782."), *with*

---

[5] Akin notes that the Report, in one instance, previewed its findings as to *Intel* factors two and three by noting a lack of "authoritative proof." *See* Report at 35; Akin Obj. at 19. It argues that the caselaw has generally employed this terminology to describe the respondent's burden of proof under factor two (but not factor three). Akin Obj. at 19–20. Even assuming *arguendo* that the respondent's burden were lower under factor three, that distinction is academic here, given the Report's bottom-line conclusion that there was no "proof"—authoritative or otherwise—"that providing discovery to Petitioner puts Respondents at risk of violating foreign sanctions law." Report at 36.

18

*Schmitz*, 376 F.3d at 82, 84 (application properly denied where German Ministry of Justice had asked district court to deny discovery, because it would "jeopardize" "the ongoing German criminal investigation" and "German sovereign rights").

Accordingly, Akin's objection based on the third *Intel* factor fails.

### C.    *Kiobel*'s Holdings as to Obtaining Discovery from Law Firms

Akin next argues that the Report's evaluation of the *Intel* factors "overlooked" or "misapplied" the Second Circuit's decision in *Kiobel*. Akin Obj. at 9 *et passim*. The Report found, expressly applying *Kiobel*, that (1) *Intel* factor one favors Akin, but (2) the concerns animating that decision do not apply to records generated in the course of Akin's lobbying—as opposing to lawyering—efforts on behalf of Fortenova. *See supra* pp. 9–10. Akin argues that the Report should have gone further, and categorically held that the fact "that the petitioner sought discovery from a client's legal counsel was enough to deny the petition." Akin Obj. at 14.

To the extent Akin construes *Kiobel* to work a blanket prohibition on obtaining discovery from the law firm of a foreign-litigation adversary, *see* Akin Obj. at 10–11, 14, Akin misreads *Kiobel*. The Second Circuit did not confront there a law firm which exercised a separate lobbying function on behalf of the client. And it did not paint with the broad brush that Akin imagines. Its decision instead followed from the circumstances of that case, which arose out of a multi-jurisdictional dispute spanning over a decade.

Esther Kiobel had initially sued Royal Dutch Shell ("Shell") in the United States under the Alien Tort Statute, 28 U.S.C. § 1350. *See Kiobel*, 895 F.3d at 240–41. The law firm Cravath Swaine & Moore ("Cravath") represented Shell in that litigation (the "ATS litigation"). *Id.* After the ATS litigation was dismissed, *see Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 114 (2013), Kiobel decided to sue Shell in the Netherlands. To assist in the contemplated Dutch

19

proceedings, Kiobel filed a § 1782 petition in this District, seeking documents of Shell in Cravath's hands. *See Kiobel*, 895 F.3d at 240–41. Cravath had custody of these documents because of its prior representation of Shell in connection with the ATS litigation. *Id.* It had previously produced those documents to Kiobel, but pursuant to a stipulated protective order that restricted their use to the U.S. litigation.[6] *Id.* at 241. The protective order required the parties to destroy or return each other's confidential material within 30 days after the respective cases' conclusions. *Id.* The documents were not discoverable from Shell in the Netherlands due to more restrictive Dutch discovery protocols. *See id.* at 246.

The district court granted Kiobel's § 1782 petition, finding it satisfied the statutory and discretionary factors. *See id.* at 242–43, 244–45. The protective order in the ATS litigation remained an obstacle, however, to Kiobel's use, in the contemplated Dutch proceedings, of the documents sought by the petition. The documents in Cravath's possession were designated as "confidential" and the protective order limited their use to the ATS litigation; its restrictions survived the ATS litigation. *Id.* at 241. As a work-around, the district court required the parties "to sign a new stipulation," under which the documents produced by Cravath could be used by Kiobel "for drafting court papers in the contemplated Dutch proceedings" but "not for publicity." *Id.* at 242. In the event Kiobel breached the new stipulation, Shell lacked the ability to enforce the confidentiality terms in the district court, because it was not a party in the § 1782 proceedings. *Id.* at 242–43.

The Second Circuit reversed. Its decision termed Kiobel's petition an "extraordinary, and possibly unique" gambit to use § 1782 to circumvent the protective order. *Id.* at 246–47. And, apart from that troubling feature of the petition, the Circuit held, the first and third *Intel* factors

---

[6] Kiobel signed the stipulated protective order. *See Kiobel*, 895 F.3d at 241.

weighed decisively against Kiobel's petition. The first factor disfavored Kiobel because "the real party" from whom documents were sought—Shell—was "involved in foreign proceedings" and "the need for § 1782 help is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Id.* at 245 (citing *Schmitz*, 376 F.3d at 85). And the third *Intel* factor disfavored Kiobel's petition because "statements made by [her] counsel demonstrate[d] that Kiobel [wa]s trying to circumvent the Netherlands' more restrictive discovery practices." *Id.* Reiterating that the *Intel* factors are "not to be applied mechanically," the Circuit expressed, with force, its concern that Kiobel's petition aimed to end-run the protective order. *Id.* Because the documents sought by the petition were covered by the protective order and because there is "a strong presumption against the modification of a protective order," the Circuit held, the district court's "decision to alter the confidentiality order without Shell's participation, and without considering the costs of disclosure to Shell, ma[d]e this case *exceptional*, and mandate[d] reversal." *Id.* at 247 (emphasis added).

Thus, contrary to Akin's reading, *Kiobel* did not deny the petition merely because it sought discovery from the law firm of Kiobel's foreign-litigation adversary. And courts in this Circuit have not read or applied *Kiobel* to work a blanket prohibition on discovery from law firms. Rather, they have inquired, in a fact-sensitive manner, whether granting discovery would offend the legal system's interests in preserving the sanctity of protective orders and attorney-client relations, the concerns noted by the Circuit by *Kiobel*. In *In re Lane*, Judge Schofield granted a petition for discovery from a law firm where, as here, *Intel* factors two, three, and four favored production. No. 22 Misc. 0034, 2022 WL 16737132, at *3–5 (S.D.N.Y. Nov. 7, 2022). That the subpoena was directed to the law firm of petitioner's foreign-litigation adversary disfavored discovery under *Intel* factor one, but it was not dispositive. *See id.* at *3. On the

21

**SPA-70**

contrary, Judge Schofield noted, the concerns in *Kiobel* related to "restrictions on gathering evidence in the foreign proceeding and the existence of a protective order" were absent. *Id.* at *4. And, she found, any "risk of turning over privileged materials" could be addressed "through privilege logs." *Id.* She thus held § 1782 discovery was appropriate. *Id.* at *3–5. Similarly, *In re Degens* granted § 1782 discovery from U.S. law firms. No. 20 Misc. 237, 2020 WL 4252725, at *1 (S.D.N.Y. July 24, 2020). There, in connection with a matrimonial dispute in Brazil, the petitioner had sought documents from law firms that had advised her former partner on the administration of his offshore assets. *Id.* at *1. Emphasizing that "law firms are not immune from discovery," Magistrate Judge Lehrburger found that the business-related work that the law firms had performed did not implicate concerns regarding attorney-client privilege and attorney work product. *Id.* at *6. For that reason, it accorded with *Kiobel* to authorize discovery.

In contrast, *In re Warren*'s fact pattern closely resembled that of *Kiobel* and warranted denying the § 1782 petition. *See* 20 Misc. 208, 2020 WL 6162214 (S.D.N.Y. Oct. 21, 2020). There, Judge Gardephe barred discovery from a law firm, which, as in *Kiobel*, had "c[o]me into possession of [the] documents solely as a result of its representation of [the client] in connection with" prior litigation, and the documents were subject to a protective order. *Id.* at *10. For this reason, Judge Gardephe found *Kiobel* controlling: "[T]he primary concern that motivated the *Kiobel* court—that documents of a foreign entity would become discoverable under Section 1782(a) solely because they were produced by the foreign entity to its U.S. counsel in connection with U.S. litigation [wa]s present." *Id.* Other cases with similar facts have denied § 1782 discovery. *See, e.g., In re Alghanim*, No. 21 Misc. 167, 2022 WL 1423088, at *3–5 (S.D.N.Y. May 5, 2022) (Swain, C.J.) (denying discovery from law firm where petition had "every

22

**SPA-71**

indication of being an archetypal fishing expedition" and *Intel* factors one, three, four, and *Kiobel*'s policy concerns weighed against production); *In re Hulley Enters., Ltd.*, 358 F. Supp. 3d 331, 351–54 (S.D.N.Y. 2019) (Gorenstein, M.J.) (denying petition after finding that "inexcusabl[e]" delay on petitioners' part, along with *Intel* factor four, disfavored discovery from law firm).

Akin is thus wrong to argue that *Kiobel* requires an outright denial of the Petition merely because Akin represented Fortenova, in part, as a law firm. *Kiobel* did not so hold. And Akin's attempt to read *Kiobel* to shield from § 1782 discovery its separate lobbying function, which is akin to the business-advisory function of the firm in *In re Degens* as to which discovery was held appropriate, does not follow from any aspect of that decision.

For three reasons, the Court holds, *Kiobel* is inapposite, and does not provide a basis for Akin's objection to the targeted discovery into lobbying services authorized by the Report.

First, authorizing discovery from Akin would not work an end run around a protective order—a central concern animating *Kiobel*. Because the documents that Cravath held were subject to a protective order, the Second Circuit stated, "[t]he decision to alter the confidentiality order without Shell's participation, and without considering the costs of disclosure to Shell, *makes this case exceptional*, and mandates reversal." *Kiobel*, 895 F.3d at 247 (emphasis added); *see id.* ("Without protective orders, 'litigants would be subject to needless annoyance, embarrassment, oppression, or undue burden or expense.'" (quoting *SEC v. TheStreet.Com*, 273 F.3d 222, 229 (2d Cir. 2001))). "Overrid[ing] the confidentiality order," the Circuit held, would imperil "full and frank communication between attorneys and their clients,' which 'promote[s] broader public interests in the observance of law and administration of justice.'" *Id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). In contrast, the documents whose

23

production the Report would authorize are not covered by a protective order. The Petition thus does not implicate *Kiobel*'s concern that "overrid[ing]" protective orders to facilitate § 1782 discovery would inhibit "foreign companies . . . from producing documents to U.S. law firms, even under a confidentiality order, lest Section 1782 become a workaround to gain discovery," *id.*

Second, the Petition here, unlike that in *Kiobel*, does not seek from a law firm internal corporate documents of its client that are "in counsel's hands solely because they were sent to the United States for the purpose of American litigation." *Id.* at 241. To the contrary, the Petition does not seek *any* documents prepared for U.S. litigation. Rather, as noted, discovery here, as the Report importantly narrows it, would be limited to documents independently created by Akin as a lobbying agent of Fortenova. *See In re BM Brazil 1 Fundo de Investimento em Participações Multistratégia*, No. 23 Misc. 208, 2024 WL 555780, at *10 (S.D.N.Y. Jan. 18, 2024) (distinguishing between subpoenaed party's "own business records" and records of the party before the foreign court proceeding); *In re Batbold*, No. 21 Misc. 218, 2023 WL 2088524, at *5 & n.1 (S.D.N.Y. Feb. 17, 2023) (collecting cases). Akin's attempt to analogize the Akin Opinion—a lobbying document allegedly intended to sway outside opinion—to the confidential corporate documents in *Kiobel* is highly unpersuasive. Fortenova affirmatively used the Akin Opinion as a sword in proceedings before the EU Council. The EU Council relied upon it as a basis to impose sanctions on SBK. In contrast, the documents sought in *Kiobel* were not used offensively, but in Cravath's hands solely because it represented Shell in prior U.S. litigation. As the Report recognized, Fortenova's "public use of the Akin Opinion means that the work relating to the Akin Opinion and Mr. Alketbi's acquisition of [SBK] becomes something more like the discoverable work of a lawyer acting as a lobbyist or business advisor." Report at 46–

24

**SPA-73**

57. And Akin has not substantiated its claim that the Petition interferes with the lawyer-client relationship. Given the important limits that the Report would place on discovery, which restrict discovery of non-publicly-disclosed materials to materials arising from lobbying work, and given §1782(a)'s preservation of legally applicable privileges, there is no discernible basis for that objection.[7]

Third, even assuming *arguendo* that the Petition implicated *Kiobel*'s policy concern that discovery from law firms would chill attorney-client communications, the thoughtful discovery limitations that the Report recommends ably address that concern. Critically, it limits document discovery to "non-privileged" materials that are "uniquely possessed by Akin or that have been shared with third parties other than Fortenova Group." *Id.* And it limits such materials to those implicating topics closely tailored to SBK's litigation needs: (1) Alketbi's acquisition of SBK; (2) the Akin Opinion; and (3) the Corporate Changes. Likewise, with respect to the Petition's request for testimony from Akin, the Report limits it to a single deposition on these topics and Akin's production. Temporally, too, the scope of discovery is narrow, from February 1, 2022 to December 31, 2023—to wit, from shortly before Alketbi's acquisition of SBK to shortly after the Corporate Changes. These parameters together focus discovery on non-privileged, publicly shared lobbying material. With these limitations, the discovery at issue ought not implicate the policy concerns that *Kiobel* found to counsel restraint.

---

[7] To the extent that Akin represented at argument before Judge Tarnofsky that some responsive documents may be covered by the attorney-client privilege, Akin's remedy is to prepare a log that enumerates, on a document-specific basis, its privilege claims. *See United States v. Constr. Prods. Rsch., Inc.*, 73 F.3d 464, 473 (2d Cir. 1996) ("To facilitate its determination of privilege, a court may require an adequately detailed privilege log in conjunction with evidentiary submissions to fill in any factual gaps." (citation omitted)).

25

**SPA-74**

Important, too, as to this discretionary factor, Akin remains at liberty to file non-frivolous overbreadth objections to particular subpoena calls. To the extent a particular demand might be indelicately formulated, such would permit further tailoring on a request-specific basis. *See, e.g., In re Genial Institucional Corretora de Cambio, Titulos e Valores Mobiliarios S.A.*, No. 24 Misc. 348, 2025 WL 40783, at *4 (S.D.N.Y. Jan. 7, 2025) ("[S]ubpoenas are not so incurably broad and burdensome that they must be quashed outright."); *Hansainvest Hanseatische Inv.-GmbH*, 364 F. Supp. 3d 243, 252 (S.D.N.Y. 2018) (similar); *cf. In re Chevron Corp.*, 749 F. Supp. 2d 141, 166–68 (2010) ("[W]ell-established procedure for the invocation of alleged privileges in response to subpoenas and other demands for tangible evidence" is "to allow the process to go forward and to adjudicate the claims of privilege in due course."). The Report recognized this avenue of relief, noting the parties' ability, subject to judicial supervision, to modulate the burdens generated by specific requests. In this respect, Akin is wrong to assert that the Report "overlooked the importance of *Kiobel* in [its] analysis of the fourth *Intel* factor." Akin Obj. at 16. To the extent Akin voices concern about the volume of materials to be reviewed for responsiveness, the Court, as with all civil discovery, expects the parties to negotiate search terms that would avoid excessive burdens on producing party. *See In re Accent Delight Int'l*

26

**SPA-75**

*Ltd.*, No. 16 Misc. 125, 2018 WL 2849724, at *5 (S.D.N.Y. June 11, 2018) (authorizing the

same), *aff'd*, 791 F. App'x 247 (2d Cir. 2019).[8]

## CONCLUSION

For the foregoing reasons, the Court adopts the Report and rejects Akin's objections to

the Report. The Court accordingly grants the Petition in part and denies it in part.

_____

[8] Insofar as Akin, in seeking wholesale denial of the Petition, claims that the Report overlooked the overall burden presented by the narrowed discovery it authorized, the Report heeded the governing standards. To "assess whether the discovery sought is overbroad or unduly burdensome," a court must "apply[] the familiar standards of Rule 26 of the Federal Rules of Civil Procedure." *Mees*, 793 F.3d at 302. "[W]hether a request is intrusive or burdensome should not be assessed based on the 'discovery scope' available in the foreign proceeding." *Id.* Rule 26(b)(1) provides that the scope of discovery is limited to "relevant" material that is "proportional to the needs of the case . . . and whether the burden or expense of the proposed discovery outweighs its likely benefit," among other factors. *Elvis Presley Enters.*, 2016 WL 843380, at *5. "Proportionality and relevance are 'conjoined' concepts; the greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate." *Vaigasi v. Solow Mgmt. Corp.*, No. 11 Civ. 5088, 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016). "[I]t is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright." *Euromepa*, 51 F.3d at 1101.

The Report here, sensitive to Akin's burden claims, applied those standards. It significantly limited the requested discovery, and found that the burden presented the approved discovery justified by the needs of SBK's foreign litigation, which, aims to recoup approximately 500 million euros in losses alleged suffered by SBK as a result of the Corporate Changes. *Compare In re BM Brazil 1 Fundo de*, No. 23 Misc. 208, 2024 WL 555780, at *17 (that production would require a "labor-intensive search of thousands of documents some of which may have to be redacted" was insufficient to demonstrate undue burden), *and In re Rodriguez Guillen*, 20 Misc. 102, 2020 WL 3497002, at *3 (S.D.N.Y. June 29, 2020), *with In re Petition of MT "BALTIC SOUL" Produktentankschiffahrtsgesellschaft mgH & Co. KG*, No. 15 Misc. 319 , 2015 WL 5824505, at *3 (S.D.N.Y. Oct. 6, 2015) ("[T]he only potentially appropriate discovery purpose Petitioners have identified is adjudication of the issue of the affiliates' alter ego status. Their request for disclosure of every financial transaction these companies have engaged in with 11 different banks, along with considerable additional financial information, sweeps far too broadly to be proper for that limited purpose."), *and In re Ex Parte Application of Apotex Inc. for Order to Obtain Discovery for Use in Action Pending Before the Federal Court in Canada*, No. M-12-160, 2009 WL 618243, at *3 (S.D.N.Y. Mar. 9, 2009) (denying petition that would have required respondent "to devote substantial resources to perform onerous searches and then review voluminous documents for a potentially small subset of . . . documents that date back nearly thirty years").

**SPA-76**

28

The Clerk of Court is respectfully directed to terminate all pending motions and to close this case, subject to the right of the parties to seek to reopen it for the limited purpose of seeking judicial resolution of discrete discovery disputes (*e.g.*, privilege objections).

SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge

Dated: May 30, 2025
      New York, New York

28

**SPA-77**

United States Code

Title 28. Judiciary and Judicial Procedure

Part V. Procedure

Chapter 117. Evidence; Depositions

§ 1782. Assistance to foreign and international tribunals and to litigants before such tribunals

(a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation.  The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.  By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement.  The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing.  To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.

(b)  This chapter does not preclude a person within the United States from voluntarily giving his testimony or statement, or producing a document or other thing, for use in a proceeding in a foreign or international tribunal before any person and in any manner acceptable to him.

**SPA-78**